IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
March 12, 2024 Session

## DONTE R. SWANIER v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Davidson County**
**No. 2015-B-865      Steve R. Dozier, Judge**

_____

**No. M2023-00233-CCA-R3-PC**

_____

The Petitioner, Donte R. Swanier, appeals from the Davidson County Criminal Court's denial of his petition for post-conviction relief, wherein he challenged his convictions of felony murder, attempted especially aggravated robbery, and attempted aggravated robbery. On appeal, the Petitioner argues that counsel provided ineffective assistance in failing to convey an offer of settlement to him prior to trial, in failing to move for a judgment of acquittal at the conclusion of the State's proof at trial and challenge the sufficiency of the evidence on direct appeal, in failing to pursue a conviction for a lesser included offense at trial, in failing to effectively argue against the admission of evidence pursuant to Tennessee Rule of Evidence 404(b), and in failing to seek suppression of cell phone records and evidence obtained from a GPS tracker placed by law enforcement on the Petitioner's vehicle. The Petitioner also maintains that the cumulative effect of counsel's deficiencies deprived him of his right to a fair trial. We affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, P.J., delivered the opinion of the court, in which TIMOTHY L. EASTER, J., joined. JAMES CURWOOD WITT, JR., J., [1] not participating.

Manuel B. Russ (at hearing) and Benjamin K. Raybin (on appeal), Nashville, Tennessee, for the appellant, Donte R. Swanier.

_____

[1] The Honorable J. Curwood Witt, a former presiding judge who served on this court for twenty-seven years, died during the pendency of this appeal. We thank him for his enduring commitment to this Court and the rule of law.

Jonathan Skrmetti, Attorney General and Reporter; Joshua Minchin, Honors Fellow, Office of the Solicitor General; Glenn R. Funk, District Attorney General; and Jennifer Charles, Assistant District Attorney General, for the appellee, State of Tennessee.


**OPINION**


Following a jury trial in 2017, the Petitioner and his co-defendant, Quintavious Patton, were convicted of felony murder, attempted especially aggravated robbery, and attempted aggravated robbery, and the co-defendant also was convicted of voluntary manslaughter. They both received effective sentences of life imprisonment. Their convictions arose out of their participation with Rayvon Walker in an attempted robbery on March 14, 2014, that resulted in the shooting death of Moises Zarate. See State v. Patton and Swanier, No. M2018-01462-CCA-R3-CD, 2020 WL 1320718, at *1-4 (Tenn. Crim. App. Mar. 19, 2020). Mr. Walker pled guilty to facilitation of felony murder and testified for the State at trial that the Petitioner drove him and the co-defendant to a residential area where Mr. Walker and the co-defendant attempted to rob the victim and another man, who was identified at trial as Adran Zanarripa, that the co-defendant shot the victim with the Petitioner's gun, and that the Petitioner remained inside his vehicle during the shooting and drove Mr. Walker and the co-defendant away from the scene. Id.

On April 1, 2016, the Petitioner made a proffer to the State in which he stated that following the shooting, the co-defendant and Mr. Walker told him that the co-defendant was the shooter. The State sought severance of the Petitioner's case from the co-defendant's case in anticipation of the Petitioner's testifying against the co-defendant at his trial that was scheduled for June 19, 2017. See id. at *1. On June 8, 2017, the Petitioner testified for the State during a pre-trial hearing on the admission of evidence pursuant to Tennessee Rule of Evidence 404(b). The Petitioner acknowledged driving the co-defendant and Mr. Walker around in a "silver gray Hyundai Sonata" on the night of the offenses. Shortly before the co-defendant's trial, the Petitioner met with the State again and recanted his prior version of the events, claiming that his identification of the co-defendant as the shooter was false and that the co-defendant and Mr. Walker told him that Mr. Walker was the shooter. The trial court subsequently granted the State's request to reconsolidate the cases and to continue the trial. The Petitioner's counsel were allowed to withdraw, and the trial court appointed other counsel to represent the Petitioner at trial.

The joint trial of the Petitioner and the co-defendant was held in October 2017, and on direct appeal, this court summarized the evidence presented at trial as follows:

> In March 2014, the victim lived at the residence of his brother, Marco
> Zarate, in Antioch, Tennessee. On the night of March 14, 2014, the brothers'

cousin, Adran Zanarripa, stopped by the house to pick up toys to deliver to family in Mexico. When Mr. Zanarripa arrived at around 9:00 p.m., the victim went outside to help load the items into Mr. Zanarripa's truck, while Marco Zarate remained inside the house.

Mr. Zanarripa testified that he and the victim were moving items from the victim's red truck into Mr. Zanarripa's truck when he saw a man grab the victim around the neck. The man who grabbed the victim was black, approximately 5'11", had a thin build, and wore his hair in long dreadlocks. The man wore a knit cap that had a bill like a baseball cap and a handkerchief covering his face. Mr. Zanarripa described the man as "young." Mr. Zanarripa then saw another man who was pointing a gun at Mr. Zanarripa, ordering him not to move. This man was also black but lighter-skinned than the man who grabbed the victim. He also wore a handkerchief over his face and was young and thin. Mr. Zanarripa turned and ran into Marco Zarate's house yelling that they were being robbed and then heard gunfire. Upon hearing the gunfire, he turned and ran back outside to the victim.

Still inside the house, Marco Zarate heard "some yelling" about a robbery and "shouts of terror." Marco Zarate testified that he looked out the bedroom window and saw gunfire before closing the curtain quickly to avoid detection. Marco Zarate said he was unable to see the shooter well because it was night and the person wore dark clothing. Marco Zarate ran downstairs and outside to where he found the victim lying on the ground. The victim was still breathing, but his breathing was labored. Marco Zarate called 911 at approximately 9:30 p.m. to request an ambulance. During the phone call to 911, Marco Zarate gave the phone to Mr. Zanarripa who provided a description, consistent with his testimony, about the suspects. The victim died before the ambulance arrived.

A neighbor, Sherrie Robinson, recalled, on March 18, 2014, before 10:00 p.m., she heard something that she initially thought was a car backfiring. After the loud bang, she heard people screaming and yelling, which caused her to look out her window. She saw two people get into a silver or light-colored compact car and drive away.

Rayvon Walker, [the co-defendant's] cousin, testified that, at the time of the shooting, he was sixteen-years-old and on spring break from high school. On Tuesday, March 18, 2014, [the co-defendant] called Mr. Walker and said that he wanted to "hang out." [The co-defendant] arrived at Mr. Walker's house with [the Petitioner], whose nickname was "Savage," and

[the co-defendant's] girlfriend, Diana Reyes. The foursome left Mr. Walker's house in [the Petitioner's] silver car. Mr. Walker was unsure of the make of the car but guessed that it might have been a Hyundai. Mr. Walker recalled that he wore a black "Georgia hoodie" and some khaki pants. Mr. Walker also brought with him another set of clothing that included a black North Carolina hooded sweatshirt and a pair of black pants.

Mr. Walker testified that they drove to a car wash. He identified a photograph of [the co-defendant], [the Petitioner], and Ms. Reyes at the car wash. In the photograph, Mr. Walker wore the Georgia sweatshirt consistent with his earlier description of his clothing. Ms. Reyes wore a pair of white rimmed sunglasses "with tint." Mr. Walker said that [the Petitioner] remained in the same clothing all day. Mr. Walker confirmed that he wore his hair in dreadlocks at the time of the shooting. Mr. Walker said that [the co-defendant] also wore his hair in dreadlocks but that his dreadlocks had been shorter than Mr. Walker's and a portion died "[y]ellowish blond."

Mr. Walker testified that the group drove to four different locations that day, one of which was a Shell gas station. The State played surveillance video obtained from the Shell gas station and asked Mr. Walker to identify the defendants in the video. Mr. Walker noted that [the Petitioner] was "a stalkier heavier guy" than [the co-defendant]. The video showed [the Petitioner] pull in at a gas station, and [the Petitioner] and [the co-defendant] exit the vehicle and walk into the Shell gas station. [The Petitioner] stood in line to pay for gas while [the co-defendant] walked around the store and then exited with [the Petitioner] when he was finished paying. The video showed the defendants return to the car where [the co-defendant] entered the front passenger side of the car, and [the Petitioner] pumped gas into the car. The men were dressed consistently with what they had been wearing in the car wash photographs. Mr. Walker explained that he and Ms. Reyes remained in the vehicle while the defendants went into the gas station.

Mr. Walker testified that next they drove to a K-Mart where all four went inside. The time stamp on K-Mart surveillance video footage showed the date as March 18, 2014, and the time as 6:48 p.m. Mr. Walker identified himself in still photographs taken from the surveillance video as the person wearing the Georgia hoodie. He also identified [the co-defendant], wearing gray, [the Petitioner], wearing a red hat, and Ms. Reyes wearing the same white-rimmed sunglasses. The group then drove to [the Petitioner's] house.

At approximately 9:10 p.m., [the Petitioner] drove [the co-defendant], Mr. Walker, and Ms. Reyes to a Knights Inn Motel ("Knights Inn") located near Bell Road. Mr. Walker said that the idea to go to the Knights Inn was initiated by the defendants. Mr. Walker had changed into the North Carolina sweatshirt and black pants and wore a black bandanna, which had been given to him by [the co-defendant], over his face and the white-rimmed sunglasses earlier worn by Ms. Reyes. [The co-defendant] also wore a black bandanna. [The co-defendant] left his cell phone with Ms. Reyes and then he and Mr. Walker exited the vehicle nearby the Knights Inn. The State played surveillance video from the Knights Inn, and Mr. Walker identified himself and [the co-defendant] on the video wearing clothing consistent with his testimony. The time stamp on the recording is March 18, 2014, at 9:10 p.m. The men returned from the Knights Inn and got into [the Petitioner's] car where they exchanged clothing so that Mr. Walker wore his Georgia hoodie while [the co-defendant] wore the North Carolina hoodie and black pants. Mr. Walker recalled that he also wore a skull cap.

Mr. Walker testified that a plan developed to commit a robbery, but he could not recall who initiated the idea. At around 9:20 p.m., [the Petitioner] drove to a neighborhood where [the co-defendant] and Mr. Walker were to rob someone with the use of [the Petitioner's] gun. Mr. Walker explained that Ms. Reyes had run away from home so the defendants wanted to steal money to pay for a motel room for a place to stay. Mr. Walker denied seeing any of the group drinking or using drugs during the time leading up to the robbery.

Mr. Walker testified that they saw two Hispanic men standing by a vehicle in a yard, and [the co-defendant] quickly developed a plan to use the gun to get the two men on the ground. Mr. Walker exited the vehicle with the hoodie over his head, still wearing the skull cap underneath and his dreadlocks "down." Mr. Walker said that he ran over and "grabbed the first person," the victim, and the two men began "tussling." [The co-defendant] ordered the victim to let Mr. Walker go, but the victim did not comply, so [the co-defendant] shot the victim. Defendant Patton and Mr. Walker then ran back to [the Petitioner's] car.

Upon further questioning, Mr. Walker added that, when they first approached the men in the yard, he ran toward the victim while [the co-defendant] ran toward Mr. Zanarippa, the other man standing in the yard. He said that [the co-defendant] fired only one shot and that after the victim was shot, Mr. Zanarippa ran to the victim. Mr. Walker said that he did not touch

either of the cars at the house with his bare hands and that both he and [the co-defendant] wore gloves at the time of the attempted robbery.

Once back inside the vehicle, the men told [the Petitioner] about what had occurred and returned the gun to him. [The Petitioner] drove to the Knights Inn. Mr. Walker identified a clip of surveillance video from the Knights Inn showing the date and time as March 18, 2014, at 9:48 p.m. The footage showed [the Petitioner] entering the lobby of the Knights Inn and renting a room. He was dressed consistently with the surveillance footage from the other locations on the day of the shooting. Mr. Walker stated that after [the Petitioner] rented a room for the night, they drove to an O'Charley's restaurant where [the Petitioner] "got out of the car for something," then they drove to Liquor World where Ms. Reyes stole a bottle of liquor. The group went to a McDonald's restaurant before returning to the Knights Inn. Mr. Walker did not recall [the Petitioner] leaving the Knights Inn again, but he agreed that the surveillance video showed [the co-defendant], Ms. Reyes, and Mr. Walker going into the motel complex and [the Petitioner's] vehicle driving away. [The Petitioner's] vehicle returned at around 10:05 p.m.

Mr. Walker testified that, the following morning, [the Petitioner] drove him home. Mr. Walker returned to school the following Monday and tried not "to think about it." On May 9, 2014, however, Detective Chad High came to Mr. Walker's school and asked to speak with him. During the interview, Mr. Walker told the police officer that [the co-defendant] shot the victim, and [the Petitioner] drove and supplied the gun. The recording of this interview was played for the jury. Mr. Walker returned to class that day but was later arrested on May 29, 2014, and transported to the east Nashville detention center. Several days after Mr. Walker's arrest, [the co-defendant] arrived at the detention center. Mr. Walker stated that he did not have any contact with [the co-defendant] initially but eventually they communicated.

On June 6, 2014, Mr. Walker provided another statement to the police, again identifying [the co-defendant] as the shooter and [the Petitioner] as the driver and the provider of the weapon. Mr. Walker stated that he pleaded guilty to facilitation of felony murder and agreed to testify truthfully against the defendants.

Mr. Walker testified that in 2016, he was at the community center for a baby shower being held for his girlfriend. Mr. Walker had not invited [the Petitioner] to the baby shower, but [the Petitioner] and another man showed up in a truck. Both men kept their hands in their pockets, causing Mr. Walker

to feel "nervous." [The Petitioner] told Mr. Walker he was out of jail on bond and that Mr. Walker had "better not [go] to court snitching." Mr. Walker said that he agreed with whatever [the Petitioner] said out of fear for the safety of his girlfriend and family present at the baby shower.

Mr. Walker testified that [the co-defendant] had called him on Valentine's Day and advised him to "plead the 5th" when he came to court to testify. The State played a recording of the phone call and distributed a transcript of this recorded conversation. Mr. Walker reaffirmed his identification of [the co-defendant] as the shooter and stated that his testimony had been truthful.

Lakesha Chambers, Mr. Walker's aunt, testified that she had raised Mr. Walker since he was two years old. Ms. Chambers explained that she had two sisters, Mr. Walker's mother, LaResha Walker, and [the co-defendant's] mother, Shameka Patton. Ms. Chambers confirmed that, prior to March 2014, she and her sister Shameka Patton had shared a close relationship. She confirmed that [the co-defendant] and Mr. Walker grew up playing together but said that the two cousins had spent less time together as they became older. Ms. Chambers was unaware that Mr. Walker was spending the day with [the co-defendant] on March 18, 2014. The following day when Mr. Walker returned home, Ms. Chambers did not notice anything "unusual" about Mr. Walker, and he mentioned nothing about the events of March 18.

Ms. Chambers recalled that on May 27, 2014, Shameka Patton came to Ms. Chambers' house, which was unusual. Ms. Patton told Ms. Chambers that she was in the area to "work out" and then went to the bathroom. Ms. Chambers remained in the kitchen cooking. When Ms. Patton did not return after a period of time, she went to look for Ms. Patton and found Ms. Patton sitting at the foot of Mr. Walker's bed and Mr. Walker sitting up in bed crying. She asked Mr. Walker why he was crying, and he replied, "just know me and [the co-defendant] going to jail for a long time." Ms. Chambers was puzzled by his response and surprised that her sister would go to Mr. Walker's room without telling her.

The parties stipulated that the Metropolitan Nashville Police Department ("MNPD") had obtained a warrant on March 7, 2014, allowing the police to place a GPS tracking device on [the Petitioner's] 2002 silver Hyundai Elantra. Through Davidson County Sheriff's Office employee Linda Griffin, the State also introduced phone records from MCC (Maximum

Correctional Center) where [the co-defendant] was housed on February 14, 2017. The records are consistent with Mr. Walker's testimony about [the co-defendant's] phone calls to him from jail.

MNPD Detective Joseph High testified that he responded to a call about a shooting in Antioch, Tennessee. After gathering information at the crime scene and speaking with the victim's brother, Marco Zarate, he returned to the police precinct and interviewed Mr. Zanarripa, the victim's cousin. After speaking with Mr. Zanarripa, Detective High determined that the police were looking for two suspects. Detective High attended the autopsy of the victim and learned that one projectile was recovered from the victim's right chest cavity.

Detective High testified that on the afternoon of March 19, 2014, he received information from the Hermitage Precinct about possible suspects. The information related to a GPS tracker that officers at the Hermitage Precinct had been monitoring. Detective High recalled that police officers had placed a GPS tracker on [the Petitioner's] 2002 silver Hyundai at around 6:30 p.m. on March 18, 2014, while the vehicle was parked in a parking lot on Murfreesboro Road near Edgehill. At this point in Detective High's testimony the trial court declared Detective High an expert in the field of mobile device call detail record analysis and analysis of GPS devices. Detective High then explained to the jury how the police monitored a tracking device. Detective High identified records containing data retrieved from the GPS tracking device placed on [the Petitioner's] vehicle.

Based upon these records, Detective High testified that [the Petitioner's] vehicle was within eighty yards of the address where the victim was shot at 9:25 p.m. on March 18, 2014. This information was consistent with Ms. Robinson's statement to the police that she had seen a silver Hyundai leave the scene at a high rate of speed around the same time. Detective High confirmed that the police used the data retrieved from the GPS tracking device and information gathered in interviews to follow the movements of the vehicle to various locations leading up to the crimes. Detective High then obtained surveillance videos from those locations confirming the defendants' presence at those locations. Detective High testified that the first location was a Shell gas station. The surveillance video showed [the Petitioner's] vehicle arrive at approximately 6:22 p.m. and remain at the gas station for between five to ten minutes.

Detective High testified that the group next went to a K-Mart located on Murfreesboro Road. Surveillance video showed that both defendants, Mr. Walker, and Ms. Reyes were dressed the same as they were at the Shell gas station. All four went into the K-Mart, remained there briefly, and then exited at 6:53 p.m. After the K-Mart stop, GPS tracking data indicated that the vehicle was located in an area off Bell Road until around 7:40 p.m. Upon leaving this area, police tracked [the Petitioner's] vehicle driving down Bell Road to Murfreesboro Road to I-24. Detective High created an animation of the vehicle's movement, which the State played for the jury. The vehicle remained in an area near a Home Depot located near Cane Ridge Road until around 9:08 p.m. Detective High noted that the vehicle was in the area of an access road that runs near the Home Depot and that there was a storage unit and a Knights Inn in the area behind the Home Depot.

Based upon this information, Detective High obtained surveillance footage from the Knights Inn. The surveillance video from March 18, 2014, at around 9:11 p.m. showed [the Petitioner's] vehicle. The GPS tracking data indicated that the vehicle then drove down Bell Road to Blue Hole Road and eventually to Antioch Pike. [The Petitioner's] vehicle then entered the area of the shooting at around 9:20 p.m. The vehicle remained in the area of the shooting for less than ten minutes. Detective High noted that the victim's brother called 911 about the shooting at 9:31 p.m. According to the GPS tracking data, [the Petitioner's] vehicle then returned to the area around the Knights Inn. Based upon this information, Detective High obtained surveillance video from a Thorntons, a Mapco, and a Liquor World, all located along Bell Road.

As part of the investigation, Detective High sought a warrant for the call detail information for [the Petitioner's], [the co-defendant's], and Mr. Walker's cell phones. The cell phone records showed locations consistent with the GPS tracking data and the surveillance videos. Detective High narrated a Power Point presentation of the call detail records. Detective High confirmed that the GPS tracking data indicated that at 10:10 p.m. [the Petitioner's] vehicle was near an O'Charley's restaurant in the area of Bell Road and Mount View Road. The GPS tracking data showed [the Petitioner's] vehicle drove to a parking lot in the vicinity of Liquor World and a McDonald's restaurant. Video surveillance footage obtained from Liquor World showed Ms. Reyes inside the Liquor World dressed in the same clothing seen in the K-Mart surveillance video. Detective High testified that surveillance video showed [the co-defendant] with Ms. Reyes, and [the Petitioner's] vehicle sitting in the northwest corner of the parking

lot. The GPS tracking data showed the vehicle traveling to the Knights Inn area from 10:30 to 10:40 p.m. The surveillance video footage from the Knights Inn was consistent with the GPS tracking data. The Knights Inn surveillance video showed [the co-defendant], Mr. Walker, and Ms. Reyes walking through the parking lot at 10:40 p.m. before [the Petitioner's] vehicle drove away. Surveillance video footage from a Thorntons Gas Station at 10:48 p.m. showed [the Petitioner] at the Thorntons located at Eagle View and Bell Road before returning to the Knights Inn for the night.

Detective High obtained surveillance footage for the following morning, March 19, 2014, which showed the defendants, Ms. Reyes, and Mr. Walker leaving the Knights Inn at 11:03 a.m. Detective High noted that the surveillance video showed a blond "patch" of hair visible at the top of [the co-defendant's] hair, similar to [the co-defendant's] appearance at the time of his arrest. Detective High stated that, during the course of his investigation, he learned that Ms. Reyes was "listed as a run away." Detective High stated that Mr. Walker was arrested for the victim's death on May 28, 2014, [the co-defendant] on June 9, 2014, and [the Petitioner] in June or July. He recalled that [the Petitioner] was later released on bond.

Throughout the course of his investigation, Detective High learned that [the Petitioner] went by the nickname "Savage." Detective High testified that he reviewed the January 17, 2017 Facebook post on [the Petitioner's] Facebook page. He identified the photograph that was the subject of the post, an album cover for "D-Savage." It depicts a handcuffed arm with tattoos holding a gun. In the lower right hand corner, it reads "Sorry 4 the Case." Detective High confirmed that [the Petitioner] had tattoos extending to his wrist, as did the person depicted in the album photograph. On June 18, 2017, while out on bond, [the Petitioner] also posted to Facebook a rap music video entitled "Another Juug." The video showed a man that looked like [the Petitioner] holding a pistol with an extended magazine clip. The following lyrics were provided to the jury in the form of a transcript and the rap video was also played:

Detectives had me on the news
Talking about murder and robbery
Murder and robbery
Rob a n***a and for what
You know a n***a is a prodigy

Detective High confirmed that, at the time of [the Petitioner's] arrest, detectives had appeared in news reports talking about the attempted robbery and murder.

Thomas Deering, the Nashville Deputy Chief Medical Examiner, testified as an expert witness in the field of forensic pathology. Dr. Deering testified that he did not perform the autopsy on the victim but that he had reviewed all of the materials associated with this case. Dr. Deering testified that the victim bled to death as a result of gunshot wounds to the arm and chest and the manner of death was homicide. Dr. Deering said that the external examination of the victim revealed five gunshot wounds, four to the left arm and one to the chest. Based upon the examination of each of the wounds, it appeared all wounds were caused by one bullet entering, exiting and then re-entering the body twice.

After the State's case-in-chief, [the co-defendant] elected not to offer any evidence, and [the Petitioner] offered the testimony of two witnesses. Breion Dixon testified that he worked in the music industry and recalled doing a video shoot on November 11 but he did not state the year. He provided a flier that he had produced and circulated inviting the public to attend the video shoot and specifically recalled that [the Petitioner] was present. Mr. Dixon reiterated that he was sure that [the Petitioner] "was at the one across the street from Morgan Park." Marcus Hemphill testified that he accompanied [the Petitioner] to the video shoot. When they arrived, they saw Mr. Walker. Mr. Walker and [the Petitioner] approached each other, and Mr. Walker "nodded and kind of spoke softly and said, yeah, I will . . . go to court and tell truth." Mr. Hemphill denied that [the Petitioner] told Mr. Walker not to "snitch" but agreed that [the Petitioner] told Mr. Walker to "tell the truth."

Patton and Swanier, 2020 WL 1320718, at *1-6 (footnote omitted). As a result of their convictions, both the Petitioner and the co-defendant received effective sentences of life imprisonment.

Trial counsel continued representing the Petitioner following the trial and the sentencing hearing, and the Petitioner, through counsel, filed a motion for new trial, challenging the sufficiency of the evidence supporting his convictions, the admission of certain evidence, statements made by the prosecutor during closing arguments, and the criminal responsibility jury instruction. Following a hearing, the trial court denied the motion for new trial. The Petitioner subsequently retained appellate counsel and filed a notice of appeal.

- 11 -

In a consolidated appeal, the Petitioner and the co-defendant both challenged the admission of the first video footage from Knights Inn showing two men approaching the lobby, turning, and fleeing. Id. at *7. The co-defendant challenged the admission of a surveillance video from a Shell gas station that showed him "stealing a bottle," alleged that his right to a speedy trial had been violated and asserted that he was entitled to relief due to the cumulative effect of the alleged errors. Id. at *9-11, 13-15. The Petitioner challenged the admission of video evidence of Ms. Reyes's stealing a bottle of liquor from Liquor World and the admission of the album cover and a portion of the rap lyrics that he had posted on Facebook. Id. at *11-13. This court affirmed the trial court's judgments. Id. at *1. The Petitioner did not file an application for permission to appeal to our supreme court.

In June 2020, the Petitioner filed a pro se petition for post-conviction relief, raising multiple allegations of ineffective assistance of counsel. Following the appointment of counsel, the Petitioner filed an amended petition in which he alleged that he received ineffective assistance of counsel prior to and during trial and on appeal. As relevant to this appeal, the Petitioner alleged that counsel were ineffective in failing to convey an offer of settlement to him prior to trial, pursue a conviction for a lesser included offense at trial, move for a judgment of acquittal at the conclusion of the State's proof and challenge the sufficiency of the evidence on direct appeal, effectively argue against the admission of evidence as violating Tennessee Rule of Evidence 404(b), and seek suppression of the cell phone records and evidence obtained from the GPS tracker placed on the Petitioner's vehicle.

**Post-Conviction Hearing.** An evidentiary hearing was held on November 9, 2022, during which the Petitioner testified and presented the testimony of his appellate counsel. The State presented the testimony of one of the attorneys who represented the Petitioner prior to trial (pre-trial counsel) and his trial counsel (trial counsel).

Appellate counsel testified that he reviewed the trial transcript prior to filing an appellate brief on the Petitioner's behalf on direct appeal. He stated that he did not raise sufficiency of the evidence as an issue on appeal because he did not believe sufficiency was a viable issue and he believed "there were two really good arguments to make in the case." He acknowledged that the determination of whether the evidence establishes criminal responsibility or facilitation of a felony requires careful consideration of the elements of each. He stated that although he "wouldn't necessarily call it a blurry line" between the two statutory provisions, he "would say that you do have to look at it carefully."

During cross-examination, appellate counsel testified that he had been practicing law since 1982, had focused primarily on criminal defense since 1993, and had represented

- 12 -

numerous defendants on appeal. He stated that, generally, he attempted to identify two or three strong issues to raise on appeal and to avoid raising other issues that could "dilute" the stronger issues and cause him to lose credibility with the courts. He said that he may have raised sufficiency had he believed the issue would impact the other issues that he raised but that "I did not see anything like that in this case." He noted that "[t]he standard for insufficiency of the evidence on appeal is very high" and that appellate courts rarely reverse convictions due to insufficient evidence. He testified that based on his experience, he did not believe this court would have overturned the Petitioner's convictions based on insufficient evidence had the issue been raised on direct appeal.

The Petitioner testified that another attorney originally represented him when he turned himself in to the police and that he and his family subsequently retained pretrial counsel and co-counsel. During the approximate one-year period in which pretrial counsel and co-counsel represented the Petitioner, they met with him "very frequently, probably at least a couple of times a month." The Petitioner said he trusted and relied upon their advice in making decisions about his case. He believed he told pretrial counsel and co-counsel early during their representation that he wanted to avoid a trial and to settle the case. He stated that pretrial counsel and co-counsel "did a great job of explaining the criminal responsibility statute and how it usually works." They explained that the jury would likely convict him of felony murder based on criminal responsibility as a result of Mr. Walker's testimony that the Petitioner provided the gun, as well as the transportation both before and after the shooting, and that the Petitioner would receive a sentence of life imprisonment. The Petitioner testified that their explanation was "kind of the nail in the coffin for me to decide to avoid a trial and to some way settle the case other than having to go to trial." Based on the advice of pretrial counsel and co-counsel, the Petitioner decided to cooperate with the State in an effort to avoid a trial and improve his chances of receiving a favorable offer. Prior to May 2016, the Petitioner met with the State and made a proffer, and he agreed to testify against the co-defendant at trial.

The Petitioner testified that on Tuesday, May 3, 2016, pretrial counsel informed him that he had been contacted by the prosecutor, who stated that she was willing to entertain a proposal from them to settle the case. The Petitioner said that based on his knowledge, the State had not made a formal offer to him at that point. On Wednesday, May 4, 2016, pretrial counsel and co-counsel met with the Petitioner at the jail, where they discussed the risks of going to trial and the evidence that the State intended to use against him. The Petitioner stated that pretrial counsel mentioned that a "decent offer" to propose to the State would be "a six-year sentence at 60 percent" and to "load [him] up on some probation." The Petitioner informed counsel of a rumor that the co-defendant had agreed to an offer of twenty-five years from the State. Pretrial counsel told the Petitioner that the co-defendant had not yet entered a guilty plea in the trial court. The Petitioner testified that he was "open" to counsel providing a proposal to the State and that he never told counsel to not

go to the State with an offer. The Petitioner said he understood that counsel were attempting to negotiate a plea agreement to be entered at the next scheduled court date on Friday, May 6, 2016.

The Petitioner testified that on Thursday, May 5, 2016, pretrial counsel met with him at the jail and informed him that the case would be set for trial. The Petitioner said that pretrial counsel reported that when he asked the prosecutor about making an offer, the prosecutor responded, "I did offer [the Petitioner] something. I offered him 25 years along with his co-defendant." According to the Petitioner, pretrial counsel told him that he responded to the prosecutor that "I thought you were joking, that's BS. We're not taking 25." The Petitioner stated that pretrial counsel informed him that during a court appearance on the following day, they would be scheduling the case for trial and that the Petitioner's presence in court was not necessary. The Petitioner maintained that he was unaware of his constitutional rights at that time, that he was "following . . . [pretrial counsel's] lead," and that he believed pretrial counsel was clearly advising him against accepting the offer. The Petitioner testified that based on his understanding, the State made a twenty-five-year offer to his counsel, that his counsel did not take the offer seriously and did not inform him of the offer, and that once pretrial counsel realized that the State was serious about the offer, pretrial counsel rejected the offer without first discussing it with the Petitioner.

The Petitioner testified that on Friday, May 6, 2016, pretrial counsel again met with him at the jail and informed him that the trial had been scheduled. According to the Petitioner, pretrial counsel informed him that the prosecutor told the trial court that the State had made a joint offer to the Petitioner and the co-defendant, that the co-defendant was the only one who was willing to accept the offer, and that, as a result, the State had opted to proceed with trial. The Petitioner stated that the prosecutor also told pretrial counsel that she was withdrawing the offer due to the co-defendant's behavior while in custody.

In response to questioning by the post-conviction court, the Petitioner acknowledged that he never told pretrial counsel that he wanted to accept the twenty-five-year offer but maintained that he "would have taken the 25, but at the time, I did not know that it was my right." He affirmed that he would have accepted the twenty-five-year offer to avoid a sentence of life imprisonment even after counsel discussed the possibility of pursuing a negotiated agreement for a six-year sentence. He maintained that even if he testified as a witness for the State at the co-defendant's trial, "there's still no guarantee of any favorable deal from the State" and that

> I know that the 25-year offer that the State had made was basically, quote-unquote, a guaranteed deal. If I was to take that 25-year offer, then I would have avoided life in prison for sure. And that 25-year offer is one that I would

- 14 -

have accepted, had I known that I had the opportunity to accept it back then, had I known about it, had I been presented with the proper paperwork as far as that plea offer, yes, I would have accepted it.

The Petitioner said he did not realize at the time that counsel could not reject the offer for him and maintained that "if I would have kn[own] that it was my right, that I had the right to take that plea offer, I would have told my attorneys to go to the District Attorney and get the paperwork for me to sign that plea offer for 25 years . . . to avoid life in prison." The Petitioner stated that although he anticipated being a cooperating witness, the State never promised him a specific sentence if he testified against the co-defendant at trial and that the twenty-five-year offer "would be something that's guaranteed right in front of my face where I could sign it and definitely avoid life in prison." The Petitioner also testified that he and counsel "were waiting [ ] to see if my co-defendant was going to sign so then once my co-defendant signed, if he would have signed, then I would have signed a deal either at the same time as him or right after him." The Petitioner affirmed that he would have agreed to any deal with the State to avoid trial so long as the co-defendant also agreed to the deal.

The Petitioner testified that after pretrial counsel and co-counsel withdrew and trial counsel began representing him, he asked trial counsel whether the State had made an offer, and trial counsel responded that the State had not and was unwilling to do so at that point. The Petitioner said that at the time that the conversation occurred, the State had made the co-defendant another twenty-five-year offer. The Petitioner stated that during his next meeting, trial counsel informed him that the State was willing to make an offer to the Petitioner only if the co-defendant accepted the twenty-five-year offer, but the co-defendant never accepted this second twenty-five-year offer. The Petitioner acknowledged that he never asked any of his attorneys to approach the State and make a settlement offer, and he stated that his "only approach was just trying to find out whether or not my co-defendant had signed for 25 years, that way I could settle my case." The Petitioner believed that once his co-defendant accepted a plea deal, the State would not be interested in trying the Petitioner and would make him a settlement offer. The Petitioner explained,

I feel like if the State would have, per se, offered my charge partner 25 years and he would have accepted it, whether I was a cooperating witness or not, I feel like they would have made me some type of offer and I would have been able to sign that and avoid going to trial and receiving a life sentence.

The Petitioner testified that he and trial counsel discussed defense strategy and lesser included offenses prior to trial. The Petitioner said that trial counsel never discussed seeking convictions on lesser included offenses as a possible defense strategy. The Petitioner stated that during the trial, he asked trial counsel about the distinction between

- 15 -

criminal responsibility and facilitation and told trial counsel that he should argue the distinction to the jury. Trial counsel told him that he believed the jury understood the difference between the two. The Petitioner believed that trial counsel was "set out on his strategy" of "the less I was talked about, the better," which involved arguing that the Petitioner was innocent and that the proof did not support the charges. The Petitioner said he believed a more effective defense strategy was to seek a conviction on a lesser included offense.

The Petitioner testified that his attorneys discussed Rule 404(b) evidence with him prior to trial. He recalled that pretrial counsel and co-counsel were upset about the music video and that trial counsel also discussed the evidence with him. Trial counsel discussed the GPS evidence with the Petitioner, including the need to limit the evidence that the police were following him because he had been committing other criminal offenses. The Petitioner did not recall trial counsel discussing evidence of other robberies with him "too much" or how the evidence of the other robberies could be excluded. The Petitioner did not recall any of his attorneys discussing ways in which the cell phone location data could be excluded.

During cross-examination, the Petitioner agreed that in May 2016, he did not want a trial, but he denied that he did not want to accept the twenty-five-year offer. He stated that pretrial counsel informed him about the offer but that pretrial counsel also stated that he told the prosecutor that "we're not taking that, that's BS." The Petitioner did not say anything to pretrial counsel in response. The Petitioner did not believe pretrial counsel asked him whether he wanted to accept the offer and said that pretrial counsel did not bring the "plea petition paperwork" to the meeting. The Petitioner did not believe pretrial counsel needed to discuss the offer with him before gathering the "plea petition paperwork" because "if I was to decide at the conclusion of that conversation that I wanted to take the 25 years, then [it] would be an appropriate time to sign that paperwork."

The Petitioner affirmed that on May 5, 2016, pretrial counsel told him that the State had withdrawn its offer to the co-defendant due to his behavior and disciplinary issues while in custody. Although the Petitioner maintained that during a meeting on May 6, 2016, pretrial counsel told him that the prosecutor informed the trial court during a hearing early that day that the case was being set for trial because she offered both the Petitioner and the co-defendant a joint offer of twenty-five years to serve and the Petitioner had declined the offer, the transcript of the hearing did not reflect any such statements by the prosecutor. Rather, according to the transcript of the May 6 hearing, which was entered as an exhibit during the post-conviction hearing, the State announced that the Petitioner would be testifying against the co-defendant and requested that the cases be severed. The trial court granted a severance and scheduled the co-defendant's case for trial.

- 16 -

The Petitioner testified that pretrial counsel and co-counsel suggested that he could avoid a life sentence by becoming a cooperating witness for the State. The Petitioner stated that they advised him that he would be "in a better position" by testifying for the State but that they did not explain "the ins and outs of it." The Petitioner said that he agreed to work with the State "[i]n hopes of receiving a favorable deal, or if not that, basically forcing my co-defendant's hand to sign for his 25-year offer, that way I could sign." He acknowledged that the State agreed to a bond reduction due to his cooperation and that he posted bond in July 2016. He stated that while released on bond, he never told pretrial counsel and co-counsel that he wanted to attempt to accept the twenty-five-year offer, but he denied that he did so because he believed that he would receive a more favorable offer from the State as a cooperating witness. Rather, he maintained that he believed that pretrial counsel had rejected the offer and that once pretrial counsel did so, "it was done and over with." Once trial counsel began his representation, the Petitioner never told him that he would accept a twenty-five-year deal.

In response to questioning by the post-conviction court, the Petitioner testified that Mr. Walker was the shooter, that the State's position was that the co-defendant was the shooter, and that the only way that the Petitioner could be a State's witness was to maintain that the co-defendant was the shooter. The Petitioner stated that he told pretrial counsel and co-counsel from the beginning of their representation that Mr. Walker was the shooter and that they were aware that he was not telling the truth during the April 2016 proffer with the State when he identified the co-defendant as the shooter. The Petitioner said that he did not know why pretrial counsel and co-counsel were shocked when he changed his story during the June 2017 meeting with the State and told them that Mr. Walker, and not the co-defendant, was the shooter. The Petitioner stated that following the June 2017 meeting with the State, no other plea offer was extended to him by the State.

During redirect examination, the Petitioner affirmed that the twenty-five-year offer from the State had expired by the time that pretrial counsel informed him of the offer on May 5, 2016. He said that pretrial counsel and co-counsel did not believe him when he informed them that Mr. Walker was the shooter. He stated that by the time that he informed them, Mr. Walker had already entered into a plea agreement with the State and that pretrial counsel and co-counsel told the Petitioner that the only way that he could testify as a cooperating witness was by maintaining that the co-defendant was the shooter. The Petitioner affirmed that during the April 2016 proffer with the State, he only told the State what he believed they wanted to hear.

The State presented the testimony of pretrial counsel, who had been practicing law since 1978 primarily in the area of criminal defense, had represented defendants in thousands of criminal cases, and had participated in 100 jury trials, most of which were homicide cases. Pretrial counsel testified that he and co-counsel were in the same office

and were retained to represent the Petitioner on July 6, 2015. Pretrial counsel met with the Petitioner at the jail approximately 23 to 24 times during his representation and met with the Petitioner's parents at his office on seven occasions. Pretrial counsel continued to meet with the Petitioner after the Petitioner posted bond in July 2016. Pretrial counsel stated that he explained the law to the Petitioner and reviewed the indictment and the "massive" amount of discovery with him.

Pretrial counsel noted that the Petitioner was not the shooter and did not have any prior felony convictions, which pretrial counsel described as "rare." Pretrial counsel testified that he and co-counsel did not want the Petitioner to be tried with the co-defendant because "[t]he evidence was very strong" and the co-defendant "was going down." Rather, they wanted the Petitioner "on the witness side of the courtroom and not on the defendant side." Pretrial counsel stated that he explained to the Petitioner that he had never had a case where his client did not receive significant consideration and a sentence reduction for testifying for the State. Pretrial counsel also explained to the Petitioner the "no-deal deal" whereby the State does not reach an agreement with a cooperating witness until after that witness testifies so that the witness can testify truthfully that the State has not made an offer in exchange for that witness's testimony.

Pretrial counsel testified that the Petitioner did not witness the shooting because he remained inside the vehicle that was parked around the corner from where the shooting occurred. Pretrial counsel stated that the Petitioner initially informed pretrial counsel and co-counsel that he was told that Mr. Walker was the shooter. Pretrial counsel spoke to the prosecutor, who was convinced that the co-defendant was the shooter. The Petitioner subsequently requested a meeting with pretrial counsel and co-counsel during which he informed them that the co-defendant was the shooter. Based upon this information, pretrial counsel contacted the prosecutor regarding the Petitioner's willingness to meet with the State for a proffer. While preparing for the proffer meeting, the Petitioner told pretrial counsel and co-counsel once again that the co-defendant was the shooter. Following the proffer, pretrial counsel believed "this was going to get us where we needed to be, which was on the witness side of the courtroom."

Pretrial counsel testified that he learned that the State made a twenty-five-year offer to the co-defendant, and the prosecutor told pretrial counsel that she was uncertain that the co-defendant would accept it. The co-defendant's reported attitude while in jail was that he would not accept any plea offer. However, the State subsequently received a signed plea petition from the co-defendant accepting the twenty-five-year offer. The prosecutor informed pretrial counsel of the Petitioner's twenty-five-year offer while they were in court. Pretrial counsel asked the prosecutor whether it was "a joke," and the prosecutor assured him that it was not. Pretrial counsel testified, "I was in shock. I was angry. My exact words with a capital B and a capital S, was that's bulls**t." He said he and co-

counsel could not believe that the State was offering "the non-shooter who was a witness" the same deal as the shooter. Pretrial counsel felt "betrayed," explaining, "I had been telling . . . my client, this young kid, who is depending upon me, we can trust this [prosecutor]. And at that moment I thought . . . you just got it in the back. . . . [I]t didn't make any sense to me that [the prosecutor] would offer him the same when he was cooperating and he wasn't the shooter."

Pretrial counsel testified that when he met with the Petitioner on the following day, he conveyed the offer to the Petitioner "in the sense of saying . . . I can't believe the bulls**t that we're dealing with right now. . . . I can't believe this. There's—something going on, et cetera, et cetera. You know, she's offering you 25 years, that's garbage. You know, that—it made no sense, and we talked about it." Pretrial counsel acknowledged that he did not discuss the offer with the Petitioner "in a very calm and professional manner" and that "[t]he conversation we had was my ranting and raving over the fact that that offer had been made." Pretrial counsel did not believe that he told the Petitioner that he had rejected the offer on the Petitioner's behalf. When asked whether the Petitioner had an opportunity to accept the offer, pretrial counsel replied, "Theoretically, yes." He explained that the Petitioner could have said to him to "just calm down, . . ., I appreciate the fact that you're fighting for me, but like you have always said, I don't need to go to trial and 25 years is a whole lot better than life," but that the Petitioner "didn't say that."

Pretrial counsel recalled that on May 6, 2016, the co-defendant's case was set for trial and that the Petitioner's case was severed from the co-defendant's case because the Petitioner was going to testify for the State at the co-defendant's trial. Pretrial counsel believed the State would provide an offer to the Petitioner that was more favorable than the twenty-five-year offer after the Petitioner testified at the co-defendant's trial. Pretrial counsel stated that he had planned to seek an agreement that involved a conviction for facilitation where the Petitioner would serve six years at 60% followed by 10 years of community corrections in an effort to obtain an approximate 15-year sentence. He had previously obtained similar agreements for other clients.

Pretrial counsel stated that at the time of the Petitioner's testimony during the pretrial Rule 404(b) hearing on June 8, 2017, pretrial counsel was unaware that the Petitioner was planning to change his story that he had previously told the State during the proffer. Pretrial counsel testified that the Petitioner first mentioned changing his story approximately three weeks before they met with the State in preparation for the co-defendant's trial. Pretrial counsel stated that the Petitioner denied receiving pressure from the co-defendant's "people," but pretrial counsel was not sure that he believed the Petitioner. Prior to the meeting with the State on June 13, 2017, pretrial counsel told the Petitioner to be truthful to the State and explained to him the risks of changing his story in that the Petitioner would no longer be a cooperating witness but would "be back in the

Defendant's chair." Pretrial counsel testified that prior to the meeting, the Petitioner never stated that he wanted to accept a plea agreement with a twenty-five-year sentence. Following the meeting, the Petitioner's case was rejoined with the co-defendant's case, and both the State and the co-defendant's attorney informed pretrial counsel and co-counsel that they could be subpoenaed as witnesses if the Petitioner testified at trial. As a result, pretrial counsel and co-counsel were allowed to withdraw as counsel for the Petitioner on June 19, 2017.

In response to questioning by the post-conviction court, pretrial counsel testified that he understood that the State's twenty-five-year offer was contingent upon acceptance by both the Petitioner and the co-defendant. He stated that "everything about that didn't make sense" and that "the way it went down" caught him and co-counsel "completely off guard, which means it would have caught [the Petitioner] off guard."

During cross-examination, pretrial counsel testified he did not believe he discussed the offer with the Petitioner on the day that pretrial counsel received the offer in court because the Petitioner was "in the back" with the co-defendant and "[i]t was just not a place to talk." Pretrial counsel recalled that the co-defendant signed a plea petition on the day that they were in court. Pretrial counsel agreed that to accept the plea, the Petitioner would have basically had to conclude that he would like to do so regardless of the advice of pretrial counsel and co-counsel and "what [they had] been telling [him] for the last year."

During redirect examination, pretrial counsel stated that the Petitioner had accepted that he would be punished for the offenses. However, based off pretrial counsel's prior experience, pretrial counsel assumed that the State would offer a sentence less than what the shooter would receive and that "real serious negotiations" would not occur until after the Petitioner testified for the State at trial. Prior to the meeting with the State in June 2017, the Petitioner never approached pretrial counsel and requested further discussions regarding a plea agreement.

Trial counsel testified that he began practicing law in June 2005, had focused primarily upon criminal defense, and had handled "hundreds" of homicide cases prior to being appointed to represent the Petitioner in June 2017. The Petitioner was released on bond when trial counsel initially began representing him. However, the State sought to revoke the Petitioner's bond, and the trial court granted the motion following a hearing. The Petitioner remained in custody for the remainder of trial counsel's representation. Trial counsel met with the Petitioner both at the jail and in court and spoke to him over the telephone. Trial counsel also utilized the services of an investigator.

Trial counsel testified that he and the Petitioner discussed the pending charges about which the Petitioner was "well versed." The Petitioner admitted that he was aware that a

robbery was to occur and that he was present during the robbery but that he believed he had no responsibility in the victim's death. They discussed lesser included offenses, and trial counsel did not believe that the Petitioner encouraged him to argue facilitation or any other lesser included offense at trial. Trial counsel informed the Petitioner that arguing for a lesser included offense required "basically an admission of some type of guilt." Trial counsel affirmed that his primary defense strategy was to attack Mr. Walker's credibility and to argue that the State failed to prove its case beyond a reasonable doubt. Trial counsel believed the trial court instructed the jury on facilitation.

Trial counsel understood that prior to his representing the Petitioner, the State filed a Rule 404(b) notice regarding a video clip of Mr. Walker and the co-defendant running down a sidewalk in front of Knights Inn. The Petitioner was not in the video. The State sought to admit the video as proof of identity and to corroborate Mr. Walker's testimony regarding the clothing that he and the co-defendant were wearing that night. Trial counsel reviewed the Petitioner's testimony during the pretrial hearing that the video was accurate, that he was not in the video, and that Mr. Walker and the Petitioner were in the video. The trial court allowed the State to introduce the video at trial. Trial counsel did not recall the State questioning Mr. Walker about an attempted robbery at Knights Inn when the video was shown at trial, and trial counsel was certain that he would have objected had the State done so.

Trial counsel testified that during a pretrial hearing, he challenged the admission of the Petitioner's rap lyrics and his album cover pursuant to Tennessee Rule of Evidence 404(b). Trial counsel stated that although he did not specifically cite Rule 404(b) during the hearing, he argued that the evidence was being introduced to prove character that was in conformity with committing murder.

Trial counsel acknowledged that the cell phone that the Petitioner was using was registered to "Lona Swanier" and that the cell phone that the co-defendant was using was registered to the co-defendant's father. Trial counsel stated that had he successfully challenged the State's application for cell phone data from the Petitioner's cell phone, the State could have obtained a search warrant that corrected any deficiencies. He said that the Petitioner's cell phone number also appeared in the call records from the co-defendant's cell phone and that he did not have standing to challenge the State's application for records from the cell phone used by the co-defendant. Trial counsel noted that other evidence was presented at trial establishing that the Petitioner was with Mr. Walker and the co-defendant during the time period leading up to and after the shooting.

Trial counsel testified that he stipulated at trial that the police had probable cause to place a tracker on the vehicle that the Petitioner was driving in order to prevent the admission of evidence of other robberies in which the Petitioner was a suspect. Trial

counsel did not consider the location points from the GPS marked by latitude and longitude lines to be subject to Rule 404(b). He affirmed that had he successfully sought suppression of the GPS data due to the State's failure to timely install the tracking device after the State's application for the installation of the advice had been granted, he would have expected the State to obtain a new search warrant or application and cure any deficiencies. He agreed that other evidence presented at trial corroborated the information obtained from the GPS tracking device, including the transcript of the Petitioner's testimony from the pretrial Rule 404(b) hearing that was entered as an exhibit at trial.

Trial counsel expressed surprise that he did not make a motion for judgment of acquittal at trial, explaining that it was his "habit" to do so. Nevertheless, he did not believe the trial court would have granted a motion for judgment of acquittal due to the "substantial" evidence against the Petitioner that the State presented at trial.

During cross-examination, trial counsel affirmed that he discussed arguing facilitation as a possible defense strategy with the Petitioner but determined that attacking Mr. Walker's credibility was a better strategy. When asked whether he talked to the Petitioner about the possibility of arguing a lesser charge and essentially admitting some level of culpability, trial counsel replied, "I don't remember it exactly like that." He recalled that he and the Petitioner discussed lesser included offenses and that trial counsel believed the challenge to Mr. Walker's credibility "was the best direction to take." Trial counsel did not believe questioning Mr. Walker about the Petitioner's involvement "would be productive," and trial counsel did not consider shifting his strategy in light of Mr. Walker's testimony at trial.

Trial counsel agreed that the video recording taken outside Knights Inn depicted Mr. Walker and the co-defendant following their participation in an attempted robbery and that the jury heard about the robbery through Mr. Walker's statement to the detective, which was presented at trial. Trial counsel believed that based on other evidence presented at trial, the jury was able to "presume" that the video depicted a robbery offense and not simply two people who happened to be outside of a business.

Trial counsel testified that prior to his representation of the Petitioner, the co-defendant filed a motion challenging the State's attachment of a GPS device on the Petitioner's vehicle, and the trial court denied the motion following a hearing. Trial counsel did not consider filing a renewed motion. He did not believe that the police installed the GPS tracking device within five days of the issuance of the order granting the State's request for the tracking device. He agreed that had the trial court determined that the police violated the Petitioner's constitutional rights by placing the tracking device on the vehicle, the State could not cure the violation by obtaining another search warrant.

- 22 -

Trial counsel testified that although the cell phone that the Petitioner was using was registered to his mother, the Petitioner, as the user of the cell phone, "[p]ossibly" had an independent privacy interest in the cell phone records and location data. Trial counsel agreed that the State did not present the cell phone data to establish that the Petitioner and the co-defendant called each other but to establish that the Petitioner's cell phone, and thus the Petitioner, was in the area at the time of the shooting. Trial counsel stated that even if he had been able to convince the trial court to suppress the cell phone data, other evidence was presented at trial to establish the Petitioner's location at the time of the shooting, including "his own testimony."

At the conclusion of the proof, the post-conviction court took the matter under advisement and issued an order on January 17, 2023, denying the Petitioner's request for post-conviction relief. In rejecting the Petitioner's claim that pretrial counsel was ineffective in failing to convey a settlement offer, the post-conviction court credited pretrial counsel's testimony that he was surprised by the State's twenty-five-year offer, that he decided against addressing it with the Petitioner on the court date when the co-defendant was present, and that he conveyed the offer to the Petitioner the following day. The court stated that pretrial counsel "clearly conveyed" his feelings of betrayal, shock, and anger to the Petitioner while discussing the offer. The court found that although the Petitioner characterized the offer as improper because it was not on paper and maintained that he would have signed the plea had he been presented with the paper, "[i]t is standard court practice to have an agreement struck between parties before the official paperwork is compiled" and that "[f]or the State to have created a signature-ready plea agreement form during the negotiation stage would have been extraordinarily unusual." The post-conviction court declined to accredit the Petitioner's assertion that pretrial counsel failed to convey the May 2016 offer to him and that he would have accepted the offer had pretrial counsel done so. The court found that pretrial counsel conveyed and explained the State's offer to the Petitioner on the day after the offer was presented to pretrial counsel and that no evidence was presented that pretrial counsel "rejected the offer after conveying it to [the Petitioner], regardless of [pretrial counsel's] expressed displeasure at the sentence length."

The post-conviction court stated that even if it were to accept the Petitioner's position during closing argument at the post-conviction hearing that due to his age and lack of experience in criminal proceedings, his will was overborne by pretrial counsel's "outsized reaction," the Petitioner's testimony "erased his own argument that he would have accepted said offer." The court noted that the Petitioner testified that trial counsel subsequently advised him of the State's willingness to agree to a subsequent twenty-five-year deal but that the Petitioner would consider accepting the offer only if the co-defendant entered a plea agreement first. The court determined that the Petitioner's testimony was "tantamount" to "a strategic decision" to refuse the twenty-five-year offer until the Petitioner first knew of the outcome of the co-defendant's decision. The court noted that

the Petitioner's "own acceptance of an offer was not dependent on [the co-defendant's] acceptance of the same" and that although the Petitioner could have informed trial counsel of his willingness to accept an offer, the Petitioner "appeared to hedge his bets by leaving his fate in the hands of [the co-defendant]." The court found that the Petitioner failed to establish that he would have accepted the twenty-five-year offer "if 'properly' conveyed by [pretrial counsel] when he had a known opportunity for second bite at the apple with trial counsel."

The post-conviction court also rejected the Petitioner's claim that trial counsel was ineffective in failing to seek a conviction for facilitation as a lesser included offense. The court found the defense strategy was to attack the credibility of Mr. Walker's testimony and argue that the State failed to meet its burden of proof and that the fact that trial counsel's strategy was unsuccessful did not render his performance deficient. The court found that the jury was instructed on facilitation as a lesser included offense and that the jury chose to convict the Petitioner of the charged offenses. The court determined that trial counsel was not deficient in the presentation of the defense theory.

The post-conviction court found that trial counsel was not ineffective in failing to move for judgment of acquittal and that appellate counsel was not ineffective in failing to challenge the sufficiency of the evidence on direct appeal. The court noted that although trial counsel expressed surprise that he failed to move for judgment of acquittal, trial counsel observed that the evidence presented against the Petitioner "was substantial and not weak in character." The court also noted that appellate counsel's testimony that he did not believe sufficiency was a viable issue and required a "very high burden" to be successful on appeal. The court concluded that the Petitioner "speculates such a motion at trial or by argument on appeal might have benefitted his defense does not rise to ineffective assistance of counsel for either proceeding."

The post-conviction court rejected the Petitioner's claim that trial counsel was ineffective in "opposing or re-opposing" the video clip of Mr. Walker and the co-defendant at Knights Inn, GPS tracker evidence, and the Petitioner's rap lyrics and album cover as violating Tennessee Rule of Evidence 404(b). The court noted that on direct appeal, this court upheld the admission of the video clip, rap lyrics, and album cover. The court also noted trial counsel's testimony that he stipulated to the GPS tracker information at trial to avoid the introduction of evidence regarding why the tracker had been placed on the vehicle and other robberies in which the Petitioner was a suspect. The court could not conclude that the Petitioner's "further and more comprehensive post-conviction arguments would have effected a different result in the 404(b) admissible evidence nor provided new material to revisit the affirmed findings."

- 24 -

In addressing the Petitioner's claim that trial counsel was ineffective in failing to seek to suppress evidence from a GPS tracker placed on his car without a warrant, the post-conviction court determined that the issue was waived pursuant to Tennessee Code Annotated section 40-30-106(g) because the ground for suppression was not raised in the motion for new trial or on direct appeal. The court also stated that the parties stipulated at trial that the State had probable cause to place the GPS tracker on the vehicle, and the court credited trial counsel's testimony that he agreed to the stipulation to prevent the introduction of evidence of other robberies in which the Petitioner was alleged to be involved. The court stated that "[a] court of competent jurisdiction issued the order for the GPS tracker to be placed" and that "[i]t is not the place of the post-conviction court to reassess the basis for its issuance, particularly where the matter was stipulated at trial." The court concluded that "[t]he grounds have not been proven by clear and convincing evidence and are without merit."

Finally, the post-conviction court rejected the Petitioner's claim that trial counsel was ineffective in failing to suppress the cell phone records because Detective High's application for judicial subpoena did not state articulable reasons why the records would materially assist the investigation and failed to establish a nexus between the information sought and the criminal offenses. The court stated that no proof was presented regarding "the wording or perceived lack of nexus for the judicial subpoenas issued in March 2014 under court order." The court determined that Riley v. California, 573 U.S. 373 (2014), which was decided during the pendency of the Petitioner's trial, was not applicable because the Petitioner's cell phone was not physically searched without a warrant. The court noted that the records were requested through a subpoena and that the standard in March 2014 was to obtain a judicial subpoena for cell phone records pursuant to Tennessee Code Annotated section 40-17-123(c). The court noted that in 2018, the United States Supreme Court issued its opinion in Carpenter v. United States, 585 U.S. 296 (2018), requiring a search warrant to obtain cell phone location data. However, the court stated that by asserting that trial counsel should have challenged the records as a "warrantless acquisition," the Petitioner "misstates the standard at the time the records were obtained."

Following the issuance of the post-conviction court's order, the Petitioner filed a timely notice of appeal. On appeal, the Petitioner asserts that counsel were ineffective in failing to convey an offer of settlement to him prior to trial, pursue a conviction for a lesser included offense at trial, move for a judgment of acquittal at the conclusion of the State's proof and challenge the sufficiency of the evidence on direct appeal, effectively argue against the admission of evidence as violating Tennessee Rule of Evidence 404(b), and seek suppression of the cell phone records and evidence obtained from the GPS tracker placed on the Petitioner's vehicle. The Petitioner also maintains that cumulative error deprived him of his right to a fair trial.

## ANALYSIS

A claim for post-conviction relief based on alleged ineffective assistance of counsel presents mixed questions of law and fact. Mobley v. State, 397 S.W.3d 70, 80 (Tenn. 2013) (citing Calvert v. State, 342 S.W.3d 477, 485 (Tenn. 2011)). In order to prevail on a petition for post-conviction relief, a petitioner must prove all factual allegations by clear and convincing evidence. Jaco v. State, 120 S.W.3d 828, 830 (Tenn. 2003). The post-conviction court's findings of fact are conclusive on appeal unless the evidence preponderates against them. Calvert, 342 S.W.3d at 485 (citing Grindstaff v. State, 297 S.W.3d 208, 216 (Tenn. 2009); State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999)). "Accordingly, appellate courts are not free to re-weigh or re-evaluate the evidence, nor are they free to substitute their own inferences for those drawn by the post-conviction court." Whitehead v. State, 402 S.W.3d 615, 621 (Tenn. 2013) (citing State v. Honeycutt, 54 S.W.3d 762, 766 (Tenn. 2001)). However, we review the post-conviction court's conclusions of law de novo with no presumption of correctness. Mobley, 397 S.W.3d at 80.

The right to effective assistance of counsel is protected by both the United States Constitution and the Tennessee Constitution. U.S. Const. amend. VI; Tenn. Const. art. I, § 9. In order to prevail on an ineffective assistance of counsel claim, the petitioner must establish that: (1) his lawyer's performance was deficient; and (2) the deficient performance prejudiced the defense. Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996); Strickland v. Washington, 466 U.S. 668, 687 (1984). A petitioner successfully demonstrates deficient performance when the petitioner establishes that his attorney's conduct fell "below an objective standard of reasonableness under prevailing professional norms." Goad, 938 S.W.2d at 369 (citing Strickland, 466 U.S. at 688; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). Prejudice arising therefrom is demonstrated once the petitioner establishes "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 370 (quoting Strickland, 466 U.S. at 694). "Because a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim." Id.

In assessing an attorney's performance, we "must be highly deferential and should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Burns, 6 S.W.3d at 462 (citing Strickland, 466 U.S. at 689). In addition, we must avoid the "distorting effects of hindsight" and must "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." Strickland, 466 U.S. 689-90. "No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of

- 26 -

circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." Id. at 688-89. However, "deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation." House v. State, 44 S.W.3d 508, 515 (Tenn. 2001) (quoting Goad, 938 S.W.2d at 369).

**A. Failure to Convey Plea Offer.** The Petitioner contends that pretrial counsel was ineffective in unilaterally rejecting a twenty-five-year plea offer before discussing it with him and in failing to explain that it was ultimately the Petitioner's decision to accept or reject the plea offer. The Petitioner maintains that he would have accepted the plea offer had he been advised of his right to do so. The State responds that pretrial counsel promptly conveyed the offer to the Petitioner and that the Petitioner otherwise failed to establish prejudice.

Trial counsel has a duty to promptly communicate and explain plea offers extended by the State. Nesbit v. State, 452 S.W.3d 779, 800 (Tenn. 2014); see Missouri v. Frye, 566 U.S. 134, 145 (2012). In doing so, trial counsel must provide the defendant "'with competent and fully informed advice, including an analysis of the risks that the [defendant] would face in proceeding to trial.'" Nesbit, 452 S.W.3d at 800 (quoting Burt v. Titlow, 571 U.S. 12, 25 (2013) (Sotomayor, J., concurring)). Whether trial counsel's advice was competent "depends as an initial matter, not on whether a court would retrospectively consider counsel's advice to be right or wrong, but on whether that advice was within the range of competence demanded of attorneys in criminal cases." McMann v. Richardson, 397 U.S. 759, 771 (1970). Trial counsel's "simple misjudgment as to the strength of the prosecution's case, the chances of acquittal, or the sentence a defendant is likely to receive upon conviction, among other matters involving the exercise of counsel's judgment, will not, without more, give rise to a claim of ineffective assistance of counsel." Michael F. Maraschiello v. State, No. M2019-01287-CCA-R3-PC, 2020 WL 7090200, at *15 (Tenn. Crim. App. Dec. 4, 2020) (quoting Com. v. Mahar, 809 N.E.2d 989, 994 (Mass. 2004); In re Alvernaz, 830 P.2d 747, 755 (Cal. 1992)).

To establish prejudice in the context of pleas, the petitioner "must show the outcome of the plea process would have been different with competent advice." Lafler v. Cooper, 566 U.S. 156, 163 (2012). "Even if the trial itself is free from constitutional flaw, the defendant who goes to trial instead of taking a more favorable plea may be prejudiced from either a conviction on more serious counts or the imposition of a more severe sentence." Id. at 166. Our supreme court has adopted the following test in determining prejudice due to counsel's deficiency in the plea process:

> [A] defendant claiming that trial counsel's performance was deficient
> in the plea negotiations process has the burden to show by a

reasonable probability that, but for counsel's deficient representation (1) the defendant would have accepted the plea, (2) the prosecution would not have withdrawn the offer, and (3) the trial court would have accepted the terms of the offer, such that the penalty under its terms would have been less severe than the penalty actually imposed.

Nesbit, 452 S.W.3d at 800-01 (citing Lafler, 566 U.S. at 164).

We note that contrary to the post-conviction court's findings, the evidence presented at the hearing did not establish that the State made the Petitioner a second twenty-five-year offer after pretrial counsel and co-counsel withdrew and trial counsel began representing the Petitioner. Rather, the only evidence presented at the hearing regarding any subsequent settlement negotiations during trial counsel's representation of the Petitioner was the Petitioner's testimony that trial counsel informed him of the State's willingness to make another settlement offer but only if the co-defendant accepted a pending twenty-five-year offer. The co-defendant, however, did not accept the second twenty-five-year offer, and the State did not engage in any further settlement negotiations with the Petitioner.

Notwithstanding the post-conviction court's findings regarding subsequent negotiations with the State, we conclude that even if pretrial counsel and co-counsel were deficient in their conveyance of the twenty-five-year offer to the Petitioner, the Petitioner failed to establish a reasonable probability that he otherwise would have accepted the offer. See Goad, 938 S.W.2d at 370 (concluding that "failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim"). Prior to the State's offer, the Petitioner agreed to serve as a cooperating witness, met with the State, and made a proffer, identifying the co-defendant as the shooter. Pretrial counsel informed the Petitioner that the State likely would not make an offer until after he testified at trial, and pretrial counsel discussed with him the possibility of a sentence that involved a period of incarceration followed by probation. Instead, the State made a twenty-five-year offer that was contingent upon acceptance by both the Petitioner and the co-defendant. No evidence was presented at the hearing that the State warned the Petitioner that if he declined the offer, no further offers would be made and that the State would insist that the Petitioner's case proceed to trial. Rather, even after pretrial counsel's confrontation with the prosecutor about the offer, the State continued to accept the Petitioner's cooperation and informed the trial court that the co-defendant's case would proceed to trial with the Petitioner testifying for the State. It was only after the Petitioner changed his story more than one year later that the State sought to proceed with trial rather than reach a plea agreement with the Petitioner. Although the Petitioner testified that he would have accepted the State's twenty-five-year plea offer, the post-conviction court declined to accredit the Petitioner's testimony, and we may not reassess the post-conviction court's determination of the credibility of witnesses. *See* Dellinger v. State, 279 S.W.3d 282, 292

(Tenn. 2009) ("It is well established that appellate courts do not reassess credibility determinations."). The Petitioner presented no other evidence that he would have agreed to accept the twenty-five-year offer rather than continue to cooperate with the State in hopes of receiving a more favorable offer.

Furthermore, although not addressed by the post-conviction court, the Petitioner also failed to establish that even if he accepted the initial twenty-five-year plea offer, the State would not have withdrawn the offer before the parties presented the agreement to the trial court for approval. Rather, the evidence established that the State withdrew the contingent offer shortly after extending it due to the co-defendant's behavior while incarcerated pending trial. We conclude that the Petitioner has not met his burden of showing that any deficiency by pretrial counsel regarding the plea agreement resulted in prejudice. The Petitioner is not entitled to relief on this issue.

**B. Failure to Challenge Sufficiency of the Evidence.** The Petitioner asserts that the evidence presented at trial is insufficient to support his conviction of felony murder based on criminal responsibility and that, instead, the evidence supports a conviction for facilitation of felony murder. He maintains that as a result, trial counsel was ineffective in failing to present a motion for judgment of acquittal at trial and that appellate counsel was ineffective in failing to challenge the sufficiency of the evidence on appeal. The State responds that the Petitioner did not establish that trial counsel's failure to present a motion for judgment of acquittal resulted in prejudice or that appellate counsel's decision against challenging sufficiency of the evidence on direct appeal constituted deficient performance and resulted in prejudice.

The trial court's only concern in reviewing a motion for judgment of acquittal is the legal sufficiency of the evidence, as opposed to the weight of the evidence. State v. Blanton, 926 S.W.2d 953, 957 (Tenn. Crim. App. 1996); Tenn. R. Crim. P. 29 ("On defendant's motion or its own initiative, the court shall order the entry of judgment of acquittal of one or more offenses charged in the indictment . . . after the evidence on either side is closed if the evidence is insufficient to sustain a conviction of such offense or offenses."). When a motion for judgment of acquittal is made at the close of all proof, "the trial court must favor the opponent of the motion with the strongest legitimate view of the evidence, including all reasonable inferences, and discard any countervailing evidence." State v. Collier, 411 S.W.3d 886, 893 (Tenn. 2013) (quoting State v. James, 315 S.W.3d 440, 455 (Tenn. 2010)), abrogated on other grounds by State v. Thomas, 687 S.W.3d 223 (Tenn. 2024). The standard by which the trial court considers a motion for judgment of acquittal is identical to that which applies on appeal in determining the sufficiency of the evidence." James, 315 S.W.3d at 455 (citing Blanton, 926 S.W.2d at 957-58 & n.5 (Tenn. Crim. App. 1996); State v. Anderson, 880 S.W.2d 720, 726 (Tenn. Crim. App. 1994)). That is, "whether, after viewing the evidence in the light most favorable to the prosecution,

any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Collier, 411 S.W.3d at 893-94 (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)).

The Petitioner challenges only his conviction for felony murder. As relevant to the instant case, first degree felony murder is "[a] killing of another committed in the perpetration of or attempt to perpetrate any . . . robbery." Tenn. Code Ann. § 39-13-202(a)(2). Robbery is "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Id. § 39-13-401(a). No culpable mental state is required for a conviction of felony murder except the intent to commit the underlying felony, id. § 39-13-202(b), and the defendant "must intend to commit the underlying felony at the time the killing occurs," State v. Buggs, 995 S.W.2d 102, 107 (Tenn. 1999).

The trial court also instructed the jury on criminal responsibility for the conduct of another as provided in Tennessee Code Annotated section 39-11-402(2). This provision states that a person is criminally responsible for an offense committed by the conduct of another if "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense[.]" Tenn. Code Ann. § 39-11-402(2). "[C]riminal responsibility is not a separate, distinct crime" but is instead "a theory by which the State may prove the defendant's guilt of the alleged offense . . . based upon the conduct of another person." State v. Lemacks, 996 S.W.2d 166, 170 (Tenn. 1999). Criminal responsibility "is a codification of the common-law theories of aiding and abetting and accessories before the fact." Id. at 171 (citing State v. Carson, 950 S.W.2d 951, 955 (Tenn. 1997)). "No particular act need be shown, and the defendant need not have taken a physical part in the crime in order to be held criminally responsible." State v. Caldwell, 80 S.W.3d 31, 38 (Tenn. Crim. App. 2002). Under a theory of criminal responsibility, a defendant's presence, association, and companionship with the perpetrator of a felony before and after the commission of the offense are circumstances from which that defendant's participation in the crime may be inferred. State v. Ball, 973 S.W.2d 288, 293 (Tenn. Crim. App. 1998). To be criminally responsible for the actions of another, the defendant must "in some way associate himself with the venture, act with knowledge that an offense is to be committed, and share in the criminal intent of the principal in the first degree." State v. Maxey, 898 S.W.2d 756, 757 (Tenn. Crim. App. 1994) (quoting Hembree v. State, 546 S.W.2d 235, 239 (Tenn. Crim. App. 1976)). "Under the theory of criminal responsibility, the evidence must establish that a defendant in some way knowingly and voluntarily shared in the criminal intent of the crime and promoted or assisted its commission." State v. Pope, 427 S.W.3d 363, 369 (Tenn. 2013).

Facilitation is a lesser included offense when a defendant is prosecuted under a theory of criminal responsibility. See State v. Fowler, 23 S.W.3d 285, 288 (Tenn. 2000). Code section 39-11-403(a) provides that "[a] person is criminally responsible for the facilitation of a felony, if, knowing that another intends to commit a specific felony, but without the intent required for criminal responsibility under § 39-11-402(2), the person knowingly furnishes substantial assistance in the commission of the felony." "The distinction between facilitation and criminal responsibility is that a person guilty of facilitation has supplied substantial assistance to the principal without the intent to promote, assist in, or benefit from the crime." State v. Joe Edward Daniels, No. M2015-01939-CCA-R3-CD, 2017 WL 1032743, at *17 (Tenn. Crim. App. Mar. 16, 2017) (citing Fowler, 23 S.W.3d at 287). In the context of facilitation of felony murder, this court has recognized that "knowledge of the specific felony required under Tennessee Code Annotated section 39-11-403 is met in a felony murder prosecution not by knowledge of the felony murder, but by the knowledge that the other person was going to commit the underlying felony." State v. Lewis, 919 S.W.2d 62, 68 (Tenn. Crim. App. 1995), overruled on other grounds by State v. Williams, 977 S.W.2d 101 (Tenn. 1998); see State v. Ely, 48 S.W.3d 710, 719-20 (Tenn. 2001) ("[T]he offense of facilitation of felony murder requires proof that . . . the defendant knew that another person intended to commit the underlying felony[.]").

At the conclusion of the State's proof at trial, the co-defendant, through counsel, moved for a judgment of acquittal, but trial counsel declined to do so on the Petitioner's behalf when prompted by the trial court. The trial court denied the co-defendant's motion, citing Mr. Walker's testimony and the corroborating evidence. Trial counsel also failed to present a motion for judgment of acquittal after the testimony of the defense witnesses and the State's rebuttal witness. During the post-conviction hearing, trial counsel offered no explanation for his failure to present a motion for judgment of acquittal, and we conclude that trial counsel's failure to present such a motion constituted deficient performance.

The Petitioner argues that there is a reasonable probability that the trial court would have granted a motion for judgment of acquittal on the basis that the State failed to prove beyond a reasonable doubt that the Petitioner had the requisite intent required for criminal responsibility. He maintains that the State failed to produce any evidence that he "'intended for the robbery to occur or that he 'shared' in his co-defendant's intent."

The evidence presented at trial, when viewed in the light most favorable to the State, established that the Petitioner drove the co-defendant and Mr. Walker around in his vehicle throughout the evening and night of the shooting. Mr. Walker testified that a plan to commit a robbery was developed because the co-defendant and his girlfriend ran away from home and needed money for a motel room. When asked whose idea it was to commit the robbery, Mr. Walker replied, "I'm not sure exactly which one of them pointed it out,

but it was [the Petitioner] or [the co-defendant]." Mr. Walker testified that according to the plan that was devised, the co-defendant and Mr. Walker would commit the robbery, and the Petitioner would serve as the driver and supply the gun, which he kept in the console of his car. Mr. Walker said that as the Petitioner drove the group around a neighborhood, "[o]ne of them" identified two people, the victim and Mr. Zanarripa, as targets. The Petitioner parked his car nearby; the co-defendant and Mr. Walker attempted to cover their faces; the co-defendant took the Petitioner's gun from the console; and the Petitioner waited in his car as the other two men set out to commit a robbery. Following the shooting, Mr. Walker and the co-defendant ran back to the Petitioner's car and told the Petitioner about the shooting, and the Petitioner was given back his gun. The Petitioner did not attempt to flee from the group or notify the authorities. Rather, he drove the group to a motel and rented a room for them.

We conclude that evidence that the Petitioner was present when the plan for the robbery was discussed, drove Mr. Walker and the co-defendant around in his car while searching for someone to rob, parked his car down the street from the chosen victims, provided the gun knowing it would be used in a robbery, waited for Mr. Walker and the co-defendant to return from committing the robbery, and drove them away from the scene and procured a motel room for them after learning of the shooting was sufficient to establish that the Petitioner shared the intent of the co-defendant and Mr. Walker to commit the robbery and aided them in their commission of the offense. Thus, the evidence is sufficient to support the Petitioner's conviction for felony murder under a theory of criminal responsibility. See State v. Guary L. Wallace, No. W2015-00708-CCA-R3-CD, 2016 WL 4494333, at *5 (Tenn. Crim. App. Aug. 25, 2016) (upholding the defendant's felony murder and multiple robbery convictions under a theory of criminal responsibility when the defendant drove the shooter to the store and supplied him with a gun knowing that the shooter intended to commit a robbery at the store); State v. Brandy Lea Birdwell, No. M2009-00722-CCA-R3-CD, 2010 WL 3582489, at *5 (Tenn. Crim. App. Sept. 15, 2010) (upholding the defendant's convictions for felony murder and especially aggravated robbery under a theory of criminal responsibility when the defendant drove the assailants to a market in her vehicle, parked at the side of the building while the assailants shot the victim with a gun belonging to the defendant's mother, and drove the assailants around for several hours before dropping them off at a house).

Because the evidence is legally sufficient to support the Petitioner's felony murder conviction, the Petitioner has failed to establish a reasonable probability that the outcome of his case would have been different had trial counsel moved for a judgment of acquittal. For the same reasons, we conclude that appellate counsel was not ineffective in declining to challenge the sufficiency of the evidence on direct appeal.

**C. Failure to Argue for a Lesser Included Offense.** The Petitioner maintains that trial counsel was ineffective in failing to employ a defense strategy that involved seeking a conviction for facilitation as a lesser included offense. The State responds that trial counsel made a strategic decision to request an instruction on facilitation as a lesser included offense but to not argue for a facilitation conviction. The State further responds that regardless, the Petitioner failed to establish prejudice.

"There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." Strickland, 466 U.S. at 689. "Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." Id. at 690-91; see Felts v. State, 354 S.W.3d 266, 277 (Tenn. 2011). Counsel must "make reasonable investigations" or "make a reasonable decision that makes particular investigations unnecessary." Strickland, 466 U.S. at 691. "When the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether." Id. The fact that a particular strategy or tactical decision failed does not, alone, establish deficiency. Goad, 938 S.W.2d at 369. "However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation." Id. (citing Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982); Cooper v. State, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992)).

The record reflects that trial counsel, who had represented defendants in "hundreds" of homicide cases prior to representing the Petitioner, met with the Petitioner on numerous occasions and utilized the services of an investigator in preparing for trial. Trial counsel and the Petitioner discussed the charges about which the Petitioner was "well versed." Although the Petitioner expressed to pretrial counsel his willingness to enter into a plea agreement, the Petitioner told trial counsel that he was present and was aware that a robbery was to occur but maintained that he had no responsibility for the victim's death. Trial counsel discussed lesser included offenses with the Petitioner but informed him that any defense seeking a conviction for a lesser included offense at trial required "an admission of some type of guilt." Rather, trial counsel employed a defense strategy whereby he attacked Mr. Walker's credibility and argued that the State failed to prove its case beyond a reasonable doubt. Given the Petitioner's statements to trial counsel refusing to accept responsibility for the victim's death, we conclude that trial counsel made a reasonable strategic decision to attack Mr. Walker's credibility and argue the State's failure to prove its case rather than argue for a facilitation conviction. Trial counsel was not deficient in this regard.

We note that the trial court instructed the jury on facilitation as a lesser included offense of the charged offenses. Furthermore, evidence that the Petitioner shared the intent of the co-defendant and Mr. Walker to commit the robbery and aided them in committing the offenses as to support the Petitioner's convictions under a theory of criminal responsibility was strong. Given the strength of the evidence supporting the Petitioner's convictions, we cannot conclude that there is a reasonable probability that the result of the trial would have been different had trial counsel sought convictions for facilitation as a lesser included offense. Thus, the Petitioner has failed to establish prejudice.

**D.  Failure to Challenge the Admission of Evidence Pursuant to Rule 404(b).** The Petitioner contends that trial counsel was ineffective in failing to challenge the admission of the video from Knights Inn, evidence related to the GPS tracker placed on the Petitioner's vehicle, and the rap lyrics written and performed by the Petitioner "in an effective manner" pursuant to Tennessee Rule of Evidence 404(b).

Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. "Evidence which is not relevant is not admissible," Tenn. R. Evid. 402, and even if evidence is deemed relevant, it may be still be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence," Tenn. R. Evid. 403.

"Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait." Tenn. R. Evid. 404(b). This rule recognizes that such evidence "carries with it the inherent risk of the jury convicting the defendant of a crime based upon his bad character or propensity to commit a crime," rather than convicting him based on the strength of the evidence. State v. Thacker, 164 S.W.3d 208, 239 (Tenn. 2005) (citing State v. Rickman, 876 S.W.2d 824, 828 (Tenn. 1994)). This risk is "particularly strong when 'the conduct or acts are similar to the crimes on trial.'" State v. Clark, 452 S.W.3d 268, 289 (Tenn. 2014) (quoting Rickman, 876 S.W.2d at 828). Such evidence, however, may be admissible for "other purposes" such as establishing motive, intent, guilty knowledge, identity of the defendant, absence of mistake or accident, a common scheme or plan, contextual background, opportunity, or preparation. Tenn. R. Evid. 404(b); State v. Berry, 141 S.W.3d 549, 582 (Tenn. 2004).

Before admitting evidence of other crimes, wrongs, or acts, the following requirements must be met:

(1) The court upon request must hold a hearing outside the jury's presence;
(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;
(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and
(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b).

**1. Video from Knights Inn.** The Petitioner challenges trial counsel's failure to object to a video from Knights Inn depicting the co-defendant and Mr. Walker approaching the lobby, turning, and fleeing as a prior bad act under Tennessee Rule of Evidence 404(b). The Petitioner asserts that the video, when considered with other evidence presented at trial, depicted "a prior, unexecuted robbery" and that the State utilized the evidence during closing argument.

The record reflects that the State filed a pretrial notice of its intent to offer the video as proof of identity pursuant to Rule 404(b). At the time of the filing of the notice, the Petitioner's case had been severed from the co-defendant's case in anticipation of the Petitioner's testifying for the State at the co-defendant's trial. The State stated that it intended to use the video as evidence of identity and that it did not plan "to mention the uncharged criminal conduct." The State specifically argued that the video corroborated the version of the events told by Mr. Walker and the Petitioner, that the two men depicted in the video were dressed in clothing consistent with Mr. Walker's statement to the police, and that the time stamp on the video placed Mr. Walker with the co-defendant shortly before the shooting. The co-defendant contested whether the video constituted proof of identity.

Following an evidentiary hearing during which both Mr. Walker and the Petitioner testified for the State, the trial court found that the video did not constitute evidence of other crimes, wrongs, or acts. The trial court further found that even if the video was subject to Rule 404(b), it was admissible as evidence of identity, which was "a highly material issue," and that the probative value of the evidence was not outweighed by the danger of unfair prejudice.

Both the Petitioner and the co-defendant challenged the admission of the video on direct appeal. See Patton and Swanier, 2020 WL 1320718, at *7-9. The court noted that the Petitioner risked waiver due to his failure to object to the admission of the video once he was no longer a State witness and his case was consolidated with the co-defendant's

case. Id. at *7. However, this court opted to review the issue as it related to both the Petitioner and the co-defendant and determined that the trial court did not abuse its discretion in admitting the evidence. Id. at *7, 9. This court agreed with the trial court's finding that "the act of wearing a bandanna and walking up to a motel" was not a criminal or prior bad act. Id. at *9. This court stated that "[t]he conduct is at best suspicious, and our supreme court has determined that only prior bad acts implicate 404(b)." Id. (citing State v. Reid, 213 S.W.3d 792, 813-814 (Tenn. 2006)). This court also agreed with the trial court's Rule 404(b) analysis, stating that the video corroborated Mr. Walker's testimony, "provided a consistent description of what the men were wearing a short time before the shooting," and "showed Mr. Walker and [the co-defendant] approaching the motel while [the Petitioner] remained in the vehicle, all of which is proof of the defendants' involvement in the crimes at issue." Id. Given this court's ruling on direct appeal, the Petitioner failed to establish that trial counsel was ineffective in failing to object to the admission of the Knights Inn video at trial.

The Petitioner asserts that trial counsel was ineffective in failing to object to evidence which he contends established that the Knights Inn video depicted "a prior, unexecuted robbery." He specifically challenges trial counsel's failure to object to the recording of Detective High's interview of Mr. Walker that was played for the jury and entered as an exhibit at trial during which the detective mentioned the robbery in questioning Mr. Walker.

The trial record reflects that during Mr. Walker's testimony on direct examination, the State played the recording of the interview, after which the co-defendant's counsel asked to approach the bench and told the trial court that the recording included a reference by the detective to a robbery at Knights Inn. The State maintained that all references to other robberies had been redacted from the recording. The trial court stated that it had not heard any such references, and the co-defendant announced his intention to review the recording again.

During a hearing outside the jury's presence after the State rested its case in chief, the co-defendant noted that approximately fifteen minutes into the recording, Detective High "mentions after you robbed that boy for the cell phone." The co-defendant requested a mistrial, arguing that the jury "has heard verbally something about the robbery for the cell phone right before these events take place." The trial court denied the co-defendant's motion for a mistrial and ordered the State to redact the detective's statement from the final version of the recording to be sent to the jury during deliberations. The trial court also instructed the jury that the detective's statements in the recordings were not admitted for the truth of the matter asserted and should not be considered in determining whether the Petitioner and the co-defendant are guilty of the charges.

Detective High's statement in the recording was so fleeting that neither the State nor the trial court heard the statement when the recording was played for the jury, and the co-defendant was less than certain that he heard the detective reference another robbery until the co-defendant heard the recording again. Although trial counsel did not lodge an objection, the co-defendant did, and the trial court took remedial actions, ordering the State to redact the statement from the recording that was to go to the jury for deliberations. The trial court also issued a curative instruction, prohibiting the jury from considering any statements by the detective for the truth of the matter asserted or in determining the guilt or innocence of the Petitioner and the co-defendant. Jurors are presumed to follow the trial court's instructions. See State v. Robinson, 146 S.W.3d 469, 494 (Tenn. 2004). Accordingly, trial counsel's failure to object did not result in prejudice.

The Petitioner asserts that the State argued during closing arguments that the incident at Knights Inn involved criminal activity. To the extent that the Petitioner claims that trial counsel was ineffective in failing to object to the State's statements during closing argument, we note that the Petitioner did not raise this issue in his amended post-conviction petition, and the post-conviction court did not address the issue in its order. Thus, the issue is waived. See Holland v. State, 610 S.W.3d 450, 458 (Tenn. 2020). Furthermore, during the post-conviction hearing, the Petitioner did not question trial counsel regarding his failure to object to the State's statements during closing argument. "'The decisions of a trial attorney as to whether to object to opposing counsel's arguments are often primarily tactical decisions,'" and "trial counsel must be given the opportunity to explain why they did not object to the allegedly prejudicial remarks." Richard Lloyd Odom v. State, No. W2015-01742-CCA-R3-PD, 2017 WL 4764908, at *36 (Tenn. Crim. App. Oct. 20, 2017) (quoting Derek T. Payne v. State, No. W2008-02784-CCA-R3-PC, 2010 WL 161493, at *15 (Tenn. Crim. App. Jan. 15, 2010)). "Without testimony from trial counsel or some evidence indicating that [their] decision was not a tactical one, we cannot determine that trial counsel provided anything other than effective assistance of counsel." Id. (quoting State v. Leroy Sexton, No. M2004-03076-CCA-R3-CD, 2007 WL 92352, at *5 (Tenn. Crim. App. Jan. 12, 2007)). Thus, the Petitioner has failed to establish that trial counsel was ineffective on this basis.

Finally, the Petitioner asserts that the Knights Inn video was admissible against only the co-defendant and that trial counsel was ineffective in failing to seek to sever the Petitioner's trial from the co-defendant's trial. The Petitioner has failed to support his argument in his brief with authority and, therefore, has waived the issue. See Tenn. R. App. P. 27(a)(7)(A); Tenn. Ct. Crim. App. R. 10(b); State v. Watson, 227 S.W.3d 622, 648 (Tenn. Crim. App. 2006). Regardless, on direct appeal, this court determined that the Knights Inn video was properly admitted against both the co-defendant and the Petitioner. See Patton and Swanier, 2020 WL 1320718, at *7, 9. The Petitioner has failed to establish deficiency or prejudice.

**2. GPS Tracker.** The Petitioner maintains that trial counsel was ineffective in failing to challenge pursuant to Rule 404(b) the admissibility of evidence that police placed a GPS tracker on his vehicle. He asserts that the evidence "led the jury to the natural inference that [he] was being surveilled by the police upon suspicion of him having committed or actively committing one or more crimes" and that "[t]his was not sanitized by prohibiting the State from soliciting the reason for the tracker, or the specific conduct being investigated." The State responds that the trial court rejected the co-defendant's Rule 404(b) challenge to the admissibility of the evidence and argues that in light of the trial court's ruling, trial counsel made a strategic decision to stipulate to the placement of the GPS tracking device to avoid the introduction of evidence regarding why the tracking device was placed on the Petitioner's vehicle. The State further responds that the placement of the GPS tracker does not implicate Rule 404(b), that even if Rule 404(b) applied, the evidence was admissible on the issue of identity, and that the Petitioner failed to establish prejudice due to the overwhelming nature of other evidence establishing the Petitioner's guilt.

After the trials of the Petitioner and the co-defendant were severed in anticipation of the Petitioner's testifying for the State at the co-defendant's trial, the co-defendant filed a motion seeking to exclude evidence that the police placed a GPS tracker on the Petitioner's vehicle pursuant to Rule 404(b). During a hearing on the motion, the co-defendant argued that evidence of the Petitioner's bad acts resulting in the placement of the GPS tracker would be imputed to the co-defendant, resulting in unfair prejudice. The State responded that the evidence was relevant in that the GPS coordinates placed the Petitioner, the co-defendant, and Mr. Walker in the area of the crime scene at the time of the shooting. The trial court denied the co-defendant's motion, finding that evidence that the co-defendant was with someone who had a GPS tracker on his vehicle was not a bad act of the co-defendant subject to Rule 404(b), that, regardless, the evidence related to the GPS tracker was probative in terms of placing the co-defendant near the crime scene at the time of the shooting, and that the information regarding the GPS coordinates could be relayed to the jury without reference to why the GPS tracking device was on the Petitioner's vehicle.

Shortly before trial, trial counsel filed a motion in limine to exclude or limit testimony regarding the reasons that the police placed the GPS tracking device on the Petitioner's vehicle. On the morning of trial, trial counsel acknowledged that the trial court previously ruled on a motion to exclude the GPS tracking information, and he argued that the State should be prohibited from introducing evidence that the police obtained a

"warrant"[2] to place the GPS tracker in the Petitioner's vehicle because the Petitioner was suspected of committing other crimes. The State offered to enter into a stipulation, to which trial counsel initially refused to agree, and the State then argued that it should be allowed to introduce the "warrant." The trial court delayed ruling on the issue until the State presented a proffer at trial.

On the following day, the State informed the trial court that the parties had agreed to a stipulation regarding the GPS tracking device. The trial court subsequently read the stipulation to the jury, which provided that on March 7, 2014, Detective Matt Atnip submitted an application for the installation of a GPS tracking device on a 2002 silver Hyundai Elantra registered to Lanae Swanier. The stipulation further provided that "[t]he application contained probable cause for a criminal court judge in Davidson County to sign the warrant."

Although the Petitioner asserts that trial counsel should have sought to exclude all evidence related to the GPS tracking device pursuant to Rule 404(b), the trial court previously denied the co-defendant's motion to exclude the evidence, finding, in part, that the evidence was probative in placing the Petitioner, the co-defendant, and Mr. Walker in the area at the time of the shooting. The State also sought to present the court order authorizing the installation of the GPS tracking device. This order, which is included in a supplemental record on appeal, stated as a basis for granting the application that there was probable cause to believe that the Petitioner and other suspects may have committed aggravated burglary and robbery. In light of these circumstances, trial counsel made a reasonable strategic decision to enter the stipulation to avoid the presentation of evidence of the circumstances that led to the police obtaining authorization for the GPS tracking device. The stipulation did not mention the Petitioner or otherwise implicate him in any criminal activity that led to the court order granting authorization for the tracker that was entered approximately one week prior to the shooting. Therefore, we conclude that trial counsel was not deficient.

**3. Rap Lyrics.** Finally, the Petitioner asserts that trial counsel was ineffective in failing to challenge the admission of the rap lyrics as evidence of "other acts" pursuant to Rule 404(b). He maintains that the evidence supported no purpose other than to conform with a character trait, that there was no clear and convincing evidence that the "other crime, wrong, or act" had occurred, and that the lyrics were "highly prejudicial" because "they presented [the Petitioner] in a negative light and suggested he had committed at least *some*

---

[2] We note that the officer submitted an "Application for Installation and Monitoring of a GPS Tracking Device," and that the court did not issue a warrant but issued an "Order Authorizing the Installation and Monitoring of a GPS Tracking Device."

robbery, even if not the one in question." The State responds that the Petitioner has failed to establish deficiency or prejudice.

The trial record reflects that trial counsel filed a motion to exclude the rap lyrics and the album cover and that the trial court denied the motion, admitting both the album cover and a redacted version of the rap lyrics. Although the Petitioner asserts that the rap lyrics were evidence of "other acts" subject to Rule 404(b), this court upheld the admission of the evidence on direct appeal as "admissions of guilt" that were relevant pursuant to Tennessee Rule of Evidence 401. See Patton and Swanier, 2020 WL 1320718, at *12-13. The court stated that "[t]he rap lyrics referenced a robbery and murder that detectives talked about in the news," that "Detective High confirmed that there was media coverage of this attempted robbery and murder," and that, therefore, "[t]his evidence had probative value as an admission by [the Petitioner] of participation in these crimes." Id. at *13; see also State v. McCaleb, 582 S.W.3d 179, 188 (Tenn. 2019) (recognizing that "a criminal defendant's admissions that he engaged in the criminal conduct with which he is charged meet the definition of relevant evidence"). Accordingly, the rap lyrics were not evidence of *other* crimes, wrongs, or acts subject to Rule 404(b). Furthermore, this court held that any error in the admission of the evidence was harmless due to the "extensive evidence" implicating the Petitioner in the offenses. Patton and Swanier, 2020 WL 1320718, at *13. The Petitioner has failed to establish deficiency and prejudice.

**E. Failure to Seek Suppression of Evidence.** The Petitioner maintains that trial counsel was ineffective in failing to seek suppression of evidence obtained by the GPS tracking device that was placed on his vehicle and the cell phone records. Our supreme court recently held that:

> to establish a successful claim of ineffective assistance of counsel based on counsel's failure to file a motion to suppress evidence on Fourth Amendment grounds, the [p]etitioner must prove: "(1) a suppression motion would have been meritorious; (2) counsel's failure to file such motion was objectively unreasonable; and (3) but for counsel's objectively unreasonable omission, there is a reasonable probability that the verdict would have been different absent the excludable evidence."

Phillips v. State, 647 S.W.3d 389, 404 (Tenn. 2022) (quoting Khalil-Alsalaami v. State, 486 P.3d 1216, 1239 (Kan. 2021)). "It remains the petitioner's burden to prove the factual allegations supporting all claims in the petition by clear and convincing evidence." Id. (citing Tenn. Code Ann. § 40-30-110(f)).

**1. Evidence from the GPS Tracker.** The Petitioner asserts that trial counsel was ineffective in failing to file a motion to suppress evidence derived from police officers'

placement of a GPS tracking device on the vehicle that the Petitioner had been driving. The Petitioner argues that the placement of the GPS tracker and the monitoring of his movements constituted a search under the Fourth Amendment and that the officers failed to obtain a search warrant. He further argues that the application and court order authorizing the placement of the GPS tracker failed to meet the requirements of a search warrant in that they failed to establish probable cause and that the order was not executed within five days of its issuance in accordance with Tennessee Rule of Criminal Procedure 41 and Tennessee Code Annotated section 40-6-107. The Petitioner maintains that a suppression motion would have been meritorious, that trial counsel's failure to file a motion to suppress was objectively unreasonable, and that there is a reasonable probability that the verdict would have been different absent the GPS evidence and "its fruits." The State responds that the Petitioner failed to incorporate a motion to suppress within the post-conviction hearing and failed to otherwise establish that a suppression motion would have been meritorious. The State further responds that trial counsel's failure to file a motion to suppress was not objectively unreasonable and that the Petitioner failed to establish a reasonable probability that the verdict would have been different absent the evidence.

We agree with the Petitioner that the post-conviction court erred in determining that this issue was waived pursuant to Tennessee Code Annotated section 40-30-106(g) due to the Petitioner's failure to raise the issue at trial or on direct appeal. Code section 40-30-106(g) provides that "[a] ground for relief is waived if the petitioner personally or through an attorney failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented." Had the Petitioner asserted as a stand-alone claim that the placement and monitoring of the GPS tracking device was unconstitutional, we agree that the claim would have been waived due to the Petitioner's failure to raise it during the trial proceedings. See, e.g., Danny Santarone v. State, No. E2018-01312-CCA-R3-PC, 2019 WL 6487419, at *8 (Tenn. Crim. App. Dec. 2, 2019); Eric Parker v. State, No. E2016-00298-CCA-R3-PC, 2016 WL 3753730, at *4 (Tenn. Crim. App. July 8, 2016). However, the Petitioner asserts that trial counsel was ineffective in failing to seek to suppress evidence. "[A] claim asserting the ineffective assistance of counsel with respect to a particular issue may be brought even when the underlying substantive issue has been waived or previously determined." Bernard Woodward v. State, No. M2022-00162-CCA-R3-PC, 2022 WL 4932885, at *4 (Tenn. Crim. App. Oct. 4, 2022), no perm. app. filed (citations omitted). Thus, we will address whether the Petitioner established that trial counsel was ineffective in failing to file a motion to suppress.

Both prior to and following our supreme court's opinion in Phillips, this court has recognized that "[i]n essence, the petitioner should incorporate a motion to suppress within the proof presented at the post-conviction hearing." Terrance Cecil v. State, No. M2009-00671-CCA-R3-PC, 2011 WL 4012436, at *8 (Tenn. Crim. App. Sept. 12, 2011); see, e.g.,

<u>Charles Thomas Johnson v. State</u>, No. M2023-00049-CCA-R3-PC, 2024 WL 2844196, at *5 (Tenn. Crim. App. June 5, 2024); <u>Rodney Earl Jons v. State</u>, No. M2022-01315-CCA-R3-PC, 2023 WL 5815740, at *24 (Tenn. Crim. App. Sept. 8, 2023), <u>no perm. app. filed</u>; <u>Floyd Hall, III v. State</u>, No. W2022-00642-CCA-R3-PC, 2023 WL 3815065, at *3 (Tenn. Crim. App. June 5, 2023), <u>no perm. app. filed</u>. The Petitioner did not incorporate a motion to suppress within the proof at the post-conviction hearing. He questioned trial counsel on a limited basis on cross-examination regarding his failure to file a motion to suppress, and the Petitioner failed to enter the application and the order authorizing the GPS tracker as exhibits during the post-conviction hearing. This court subsequently granted the Petitioner's request to supplement the appellate record with the application and the order, and the Petitioner claims that the order was unconstitutional on its face and that no additional proof was necessary to resolve the issue. Notwithstanding the Petitioner's failure to present evidence during the post-conviction hearing, we conclude that based on the applicable law at the time of the Petitioner's trial, the order authorizing the GPS tracker was constitutional on its face.

The record reflects that on March 7, 2014, Detective Matthew Atnip with the Metro Nashville Police Department submitted an "<u>APPLICATON FOR INSTALLATION and MONITORIG OF A GPS TRACKING DEVICE</u>" for a 2002 Silver Hyundai Elantra to the Criminal Court for Davidson County. The application listed the VIN and license number of the vehicle and provided the following basis for the request for a GPS tracker:

> On February 27th, 2014[,] the suspect vehicle was photographed at the scene of [a] residential Burglary. A neighbor overheard the residential alarm activate and went outside and observed the suspect vehicle. The neighbor recorded the above tag. When the homeowner of the burglary arrived, the suspects exited the house. One of the suspects fired a gun at the victim homeowner. Another victim was arriving at his residence and was approached by one of the fleeing suspects. That suspect pointed a pistol at this victim and demanded his car keys. The suspects fled in the listed vehicle. Donte Swanier was developed as a suspect during the investigation into the occupants of this tag. The tag is registered to Lonay Swanier, [the] suspect's mother.

Detective Atnip requested an order to track the vehicle for 60 days, and he signed the application as true under penalty of perjury. A criminal court judge signed the application as sworn to and subscribed before him on March 7, 2014.

The judge signed the "<u>ORDER AUTHORIZING the INSTALLATION and MONITORING OF A GPS TRACKING DEVICE</u>" on the same day. The order stated that Detective Atnip submitted under oath the application for an order authorizing the

installation of a GPS tracking device pursuant to Tennessee Code Annotated 16-10-101.[3] The order further stated that "there is probable cause to believe <u>Donte Swanier and other unknown suspects</u> may have committed and is committing the offense of Aggravated Burglary and Robbery." The judge found that the installation and monitoring of the GPS tracking device was required for the investigation of an aggravated robbery and aggravated burglary. The order authorized officers to install the GPS tracking device and, "for a period of sixty (60) days from the date of this Order, to remotely retrieve the information from the tracking device as needed to further the investigation, including the data recorded while inside any private garage or other location not open to the public, or visual surveillance, and within the boundaries of the United States."

Both the state and federal constitutions offer protection from unreasonable searches and seizures; the general rule is that a warrantless search or seizure is presumed unreasonable and any evidence discovered is subject to suppression. <u>See</u> U.S. Const. amend. IV ("The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ."); Tenn. Const. art. I, § 7 ("That the people shall be secure in their persons, houses, papers and possessions, from unreasonable searches and seizures . . . ."). "[T]he most basic constitutional rule in this area is that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment-subject only to a few specifically established and well delineated exceptions.'" <u>Coolidge v. New Hampshire</u>, 403 U.S. 443, 454-55 (1971) (alteration in original) (quoting <u>Katz v. United States</u>, 389 U.S. 347, 357 (1967)); <u>see also</u> <u>State v. Bridges</u>, 963 S.W.2d 487, 490 (Tenn. 1997).

More than two years before officers placed the GPS tracking device on the vehicle driven by the Petitioner, the United States Supreme Court held in <u>United States v. Jones</u> that the government's installation of a GPS tracking device on a vehicle and the use of the device to monitor the vehicle's movements constituted a "search" under the Fourth Amendment. <u>United States v. Jones</u>, 565 U.S. 400, 404 (2012). Relying on this holding in <u>Jones</u> and this court's opinion in <u>State v. Jerry Brandon Phifer</u>, the Petitioner contends that the officer's failure to obtain a search warrant before placing the GPS tracking device on the vehicle and monitoring the vehicle movements rendered the search unconstitutional. <u>See</u> <u>State v. Jerry Brandon Phifer</u>, No. M2013-01401-CCA-R3-CD, 2014 WL 4698499, at *13-16 (Tenn. Crim. App. Sept. 23, 2014). In <u>Jerry Brandon Phifer</u>, this court held that the officer's attaching a GPS device to the defendant's vehicle was an unconstitutional

---

[3] Tennessee Code Annotated section 16-10-101 provides, "The circuit court is a court of general jurisdiction, and the judge of the circuit court shall administer right and justice according to law, in all cases where the jurisdiction is not conferred upon another tribunal."

search because the officer failed to obtain a search warrant and the search did not fall within one of the exceptions to the warrant requirements. Id. at *13-14.

Unlike the officer in Jerry Brandon Phifer, however, the officer in the present case sought and received a court order in which the court found probable cause for the placement of the GPS device on the vehicle and the use of the device to monitor the vehicle's movements. The Supreme Court has noted that the issue of whether a "search" occurred is a "separate matter" from whether the search was reasonable and that *Jones* did not purport "to resolve the question of what authorization may be required to conduct such electronic surveillance techniques." Carpenter v. United States, 585 U.S. 296, 307 n.2 (2018). This court has recognized that in Jones, the Supreme Court "held that the government's installation of a GPS device and use of the device to monitor a vehicle's movements constituted a search under the Fourth Amendment but that the Court noticeably stopped short of stating that the search required a warrant or some standard of suspicion." State v. Vernon Elliott Lockhart, No. M2013-01275-CCA-R3-CD, 2015 WL 5244672, at *31 (Tenn. Crim. App. Sept. 8, 2015); see also Com. v. Arthur, 62 A.3d 424, 431-32 (Pa. 2013) (stating that "Jones is limited to the finding that the placement of a GPS device by the government on a private vehicle, without a warrant or some other judicial preclearance offends the Fourth Amendment" and that "[t]he Supreme Court specifically declined to address what procedure was required or what degree of suspicion was required to support any such application").

This court has upheld law enforcement's installation and monitoring of a GPS tracking device on a vehicle when the officer filed an application for the GPS device and the trial court entered an order granting the application. Vernon Elliott Lockhart, 2015 WL 5244672, at *30-31. This court reasoned that "the order was signed by a neutral and detached magistrate, that the application for the order established probable cause, and that the application sufficiently identified the target vehicle." Id. at *31. This court concluded that the installation and tracking of the GPS device on the vehicle without a search warrant did not run afoul of Jones. Id.

The Petitioner asserts that unlike the application and order in Vernon Elliott Lockhart, the application and order in the present case failed to establish probable cause. We note that the Petitioner offers only a limited argument in his initial brief on the issue. In one portion of his brief, he alleges without further argument that "the application . . . and court order fail to sufficiently demonstrate that there was probable cause to justify a GPS tracker and that the evidence relied upon was sufficiently reliable." In another portion of his brief, he asserts without further argument that "[t]here was a finding of probable cause that [he] 'may have committed and is committing' various offenses, but not that 'a search would uncover evidence of wrongdoing.'" Appellate briefs must contain an argument setting forth "the contentions of the appellant with respect to the issues presented,

- 44 -

and the reasons therefor, including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record." Tenn. R. App. P. 27(a)(7)(A). "Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court." Tenn. Ct. Crim. App. R. 10(b). The Petitioner's initial brief comes dangerously close to failing to adhere to the requirements of Rule 27(a)(7). Furthermore, in the Petitioner's reply brief, he argues in a footnote that the application failed to establish probable cause because the application included no support for the statement that he "was developed as a suspect during the investigation," the application failed to prove a nexus between the place to be searched and the evidence sought, and the application included no indication of "how placing the GPS tracker would yield any evidence regarding the prior crime or any others." However, the Petitioner failed to cite to any authority to support his claims, and to the extent that he raises new arguments in his reply brief, these arguments are waived. See Tenn. R. App. P. 27(a)(7)(A); Tenn. Ct. Crim. App. R. 10(b). The Petitioner also incorrectly states that the State failed to dispute his argument regarding the lack of probable cause in its brief. The State argued in its brief that the application and order met the requirements set forth in Vernon Elliott Lockhart, including the establishment of probable cause.[4] Furthermore, regardless of the inadequacies in the Petitioner's brief, we conclude that the application established probable cause for the installation and monitoring of the GPS tracking device.

"Probable cause for the issuance of a search warrant exists when, 'given all the circumstances set forth in the affidavit … there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" State v. Aguilar, 437 S.W.3d 889, 899 (Tenn. Crim. App. 2013) (quoting Illinois v. Gates, 462 U.S. 213, 238 (1983)). The determination of probable cause is made based upon consideration of the totality of the circumstances. State v. Tuttle, 515 S.W.3d 282, 289 (Tenn. 2017). "The nexus between the place to be searched and the items to be seized may be established by the type of crime, the nature of the items, and the normal inferences where a criminal would hide the evidence." State v. Smith, 868 S.W.2d 561, 572 (Tenn. 1993). Because the probabilities involved in making the probable cause determination "are not technical" but are, instead, "the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act," Tuttle, 515 S.W.3d at 300 (quoting Brinegar v. United States, 338 U.S. 160, 175 (1949)), the determinations "are extremely fact-dependent," id. (quoting State v. Bell, 429 S.W.3d 524, 534 (Tenn. 2014)). Given the fact-driven nature

---

[4] Although the State filed a response to the petitioner's amended post-conviction petition that included a general denial of the petitioner's claims, the petitioner asserts for the first time in his reply brief that the State waived its contention that the application and order established probable cause by failing to make the specific argument in the post-conviction court. The petitioner waived this argument on appeal by failing to cite any authority to support his claim. See Tenn. R. App. P. 27(a)(7)(A); Tenn. Ct. Crim. App. R. 10(b).

of the probable cause determination, a reviewing court must "afford 'great deference' to a magistrate's determination that probable cause exists." Id. (citations omitted).

According to the application, officers connected the vehicle to an aggravated burglary and an aggravated robbery through photographs showing the vehicle at the crime scene and through information supplied by witnesses, including the vehicle's license plate number. Officers determined the make, model, and VIN of the vehicle and included the information in the application. The vehicle was registered to the Petitioner's mother, and the Petitioner was developed as a suspect. The offenses involved multiple perpetrators, all of whom occupied the same vehicle, and the application did not indicate that any suspects other than the Petitioner had been identified. Based on the totality of the circumstances, the application established a logical nexus between the vehicle and the offenses and a fair probability that monitoring the vehicle would result in additional evidence of the offenses, including the identities of other suspects. Thus, we conclude that the application established probable cause for the installation and use of the GPS tracking device.

The Petitioner maintains that the officer failed to execute the order by installing the GPS tracking within five days of issuance of the order in accordance with Tennessee Rule of Criminal Procedure 41 and Tennessee Code Annotated section 40-6-107. However, this court has held that the requirements of Rule 41 only apply to search warrants and do not apply to an "ORDER AUTHORIZING the INSTALLATION and MONITORING OF A GPS TRACKING DEVICE" issued pursuant to Code section 16-10-101. Vernon Elliott Lockhart, 2015 WL 5244672, at *31. Code section 40-6-107 likewise expressly applies to search warrants and is not applicable to the application and order in the present case. The Petitioner has failed to establish that a motion to suppress would have been meritorious. Accordingly, trial counsel was not ineffective in failing to file a motion to suppress evidence obtained as a result of the GPS tracking device.

**2. Cell Phone Records.** The Petitioner maintains that trial counsel was ineffective in failing to seek to suppress the cell phone records used at trial to corroborate Mr. Walker's testimony and to place the Petitioner, the co-defendant, and Mr. Walker at the crime scene and other areas that were depicted on surveillance footage. The Petitioner argues that the records were obtained by a court order rather than a search warrant in violation of his Fourth Amendment rights set forth in Riley v. California, 573 U.S. 373 (2014), and Carpenter v. United States, 585 U.S. 296 (2018). The Petitioner also argues that even if Riley and Carpenter did not apply, the application and order did not comply with the subpoena requirements set forth in Tennessee Code Annotated section 40-17-123. He submits that a motion to suppress would have been meritorious, that trial counsel's failure to file the motion was objectively unreasonable, and that there is a reasonable probability that the verdict would have been different absent the cell phone records. The State responds that the Petitioner failed to show that the motion would have been meritorious, arguing that

the Petitioner failed to incorporate a motion to suppress within the proof presented at the post-conviction hearing and that the officer who obtained the subpoena followed the law that was in effect at the time. The State also asserts that trial counsel's failure to file the suppression motion was not objectively unreasonable and that due to the overwhelming evidence of guilt, the Petitioner cannot show a reasonable probability that the verdict would have been different but for trial counsel's failure to file a motion to suppress.

At trial, the State presented the records from the cell phones that the Petitioner, Mr. Walker, and the co-defendant were using on the evening of the offenses. Detective High testified regarding his analysis of the cell phone records, including calls between the Petitioner and the co-defendant and cell site location information. Detective High stated that based on his analysis of the cell phone records, the Petitioner, the co-defendant, and Mr. Walker stayed in close proximity to one another throughout the evening of the offenses. Detective High also stated that their cell site location information was consistent with the GPS tracking information from the Petitioner's vehicle and with their being in the area of the crime scene when the offenses occurred.

To the extent that the Petitioner claims that trial counsel was ineffective in failing to seek to suppress the records from the cell phones of the defendant and Mr. Walker, we conclude that the Petitioner lacked standing to challenge the constitutionality of the officer's obtaining these records. See State v. Jerrico Lamont Hawthorne, No. E2015-01635-CCA-R3-CD, 2016 WL 4708410, at *26 (Tenn. Crim. App. Sept. 7, 2016) (holding that the defendant did not have standing to challenge the constitutionality of the State's obtaining via subpoena the cell phone records and data of another's cell phone because the defendant "had no reasonable expectation of privacy in another person's cell phone data and records"); see also Jason White v. State, No. W2022-01437-CCA-R3-PC, 2023 WL 6142444, at *22 (Tenn. Crim. App., Jackson, Sept. 20, 2023), perm. app. denied (Tenn. Apr. 11, 2024). Thus, trial counsel did not render ineffective assistance by not seeking to suppress the records from the cell phones of the co-defendant and Mr. Walker.

Regarding trial counsel's failure to seek to suppress the Petitioner's cell phone records, we note that evidence presented at trial establishing that the Petitioner was with the co-defendant and Mr. Walker throughout the evening of the offenses and served as the getaway driver was overwhelming. This evidence included Mr. Walker's testimony, testimony from witnesses who saw a vehicle matching the description of the Petitioner's vehicle leaving the scene following the shooting, the transcript of the Petitioner's testimony from a prior proceeding during which he acknowledged driving the co-defendant and Mr. Walker on the evening of the offenses, surveillance video, and the coordinates from the GPS tracking device attached to the Petitioner's vehicle. Given this overwhelming evidence, the Petitioner failed to establish a reasonable probability that the verdict would

have been different absent the Petitioner's cell phone records. Accordingly, trial counsel was not ineffective in failing to seek to suppress the Petitioner's cell phone records.

F. **Cumulative Error.** The Petitioner argues that he was prejudiced by the cumulative effect of counsel's multiple instances of deficient performance. "[I]n the context of an ineffective assistance of counsel claim, cumulative error examines the prejudicial effect of multiple instances of deficient performance." Bryant Jackson Harris v. State, No. E2022-00446-CCA-R3-PC, 2022 WL 17729352, at *9 (Tenn. Crim. App. Dec. 16, 2022) (citation and internal quotation marks omitted), perm. app. denied (Tenn. Apr. 18, 2023). The issue is whether counsel's deficiencies "cumulatively prejudiced . . . the right to a fair proceeding and undermined confidence in the outcome of the trial." Timothy Terrell McKinney v. State, No. W2006-02132-CCA-R3-PD, 2010 WL 796939, at *37 (Tenn. Crim. App. Aug. 25, 2010). The Petitioner has failed to establish multiple deficiencies by counsel that resulted in prejudice when considered individually or in their aggregate. Accordingly, the Petitioner is not entitled to relief.

## CONCLUSION

Based on the foregoing analysis, we affirm the judgment of the post-conviction court.

_____
CAMILLE R. MCMULLEN, PRESIDING JUDGE